CYNTHIA M. JUDY
8882 Dyer Road
Prunedale, CA 93907-8780
(831) 663-8851
State Bar No. 169648


Attorney for Plaintiff,
REVOLUTIONARY SOFTWARE, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

REVOLUTIONARY SOFTWARE, INC.                    CASE NO.  C05-03127 JW

      Plaintiff,                                              ORDER

v.

ECLIPSYS CORPORATION,
a corporation, et al.

_____/

      Pursuant to the Stipulation to Filing of Amended Complaint on or before September

8, 2006, which has been entered into between the Plaintiff and Defendant in the above-entitled

action, by and through their attorneys of record, it is ORDERED, ADJUDGED and DECREED, that

Plaintiff REVOLUTIONARY SOFTWARE, INC., shall be allowed to file the Amended Complaint,

which is attached as Exhibit A.  The Stipulation, itself, is attached as Exhibit B.


DATED:   September ___12___, 2006          IT IS SO ORDERED:




                                           _____
                                           JUDGE OF THE UNITED STATES DISTRICT
                                           COURT, NORTHERN DISTRICT OF CALIFORNIA

# EXHIBIT   A

# FIRST AMENDED COMPLAINT

CYNTHIA M. JUDY
8882 Dyer Road
Prunedale, CA  93907-8780
(831) 663-8851
State Bar No. 169648

Attorney for Plaintiff
REVOLUTIONARY SOFTWARE, INC.

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REVOLUTIONARY SOFTWARE, INC.,<br><br>Plaintiff,<br><br>vs.<br><br>ECLIPSYS CORPORATION, a corporation;<br>and DOES ONE through TEN, inclusive,<br><br>Defendants. | Case No.:  C05-03127 JW<br><br>**FIRST AMENDED COMPLAINT FOR BREACH OF CONTRACT, BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING, COMMON COUNTS, AND CONVERSION AND MISAPPROPRIATION**<br><br>(Amount demanded exceeds $10,000.) |

Plaintiff REVOLUTIONARY SOFTWARE, INC. alleges:

### FIRST CAUSE OF ACTION:
### BREACH OF CONTRACT

1.     Plaintiff REVOLUTIONARY SOFTWARE, INC. is a corporation organized and existing under the laws of the State of California and is and was at all times mentioned herein qualified to do business in California.

2.     Plaintiff is informed and believes and thereupon alleges that Defendant ECLIPSYS CORPORATION ("ECLIPSYS") is a Delaware corporation.  The true names and capacities of Defendants DOES ONE through TEN are unknown to plaintiff, and plaintiff will seek leave of court

- 1 -

1   to amend this complaint to allege such names and capacities as soon as they are ascertained.

2   Plaintiff believes that each of the fictitiously named defendants are in some manner actionably

3   responsible for the matters herein alleged.

4           3.      This court is the proper court because injury to person or damage to personal property

5   occurred in its jurisdictional area, and the plaintiff and defendants agreed in a written contract that

6   actions arising under the contract could be commenced in either state court in Santa Cruz, California,

7   or federal court in San Francisco, California.  Plaintiff filed the complaint in Superior Court, County

8   of Santa Cruz, on June 23, 2005.  Citing diversity, Defendant ECLIPSYS removed the case to U.S.

9   District Court in August, 2005, and both parties consented to a San Jose assignment in November,

10  2005.

11          4.      Plaintiff is informed and believed and thereon alleges that at all times herein

12  mentioned, each defendant was the agent, servant, and employee of each of the other defendants, and

13  in acting and omitting to act as alleged herein, was acting in the scope of his, her, or its authority as

14  such agent, servant, or employee with the permission and consent of his, her, or its

15  co-defendants.

16          5.      Plaintiff REVOLUTIONARY SOFTWARE, INC. (hereinafter "RSW") was

17  incorporated in 1988.  Since its inception, the company has developed, copyrighted, supported, sold,

18  and licensed software products for business, scientific, educational, and government applications.

19  One such product is a unique, copyrighted software program, "/rdb," (pronounced "slash-r-d-b").

20  Among the features that make "/rdb" unique are its subroutines that enable users to insert and

21  retrieve database information rapidly using a variety of interfaces.  The "/rdb" system integrates and

22  links with other information technology systems and types of hardware, such as Oracle, Sybase,

23  Informix, IBM, and Sun.

- 2 -

6.     On or about February 8, 1993, a written agreement was made between Plaintiff RSW and EMTEK Health Care Systems, (hereinafter "EMTEK"), an Arizona corporation and a subsidiary of Motorola, a Delaware corporation, a copy of which is attached as Exhibit A and incorporated herein by this reference.  Under the terms of this Software License Agreement, EMTEK, as licensee, agreed to pay license fees for use of Plaintiff RSW's copyrighted relational database software, "/rdb," in its Clinical Information Management System, which is comprised of EMTEK's software and "/rdb." License fees were to be calculated based on the number of workstations that were part of every Clinical Information Management System furnished, reproduced, sublicensed, given away, or distributed in any manner whatsoever in the U.S. and foreign countries, and the contract required EMTEK to make monthly sales reports.  Plaintiff RSW, as licensor, agreed to provide ongoing updates and support for its software and to place a copy of the source code for the licensed software in an escrow account.  The Software License Agreement provided a method for resolving disputes, procedures for notifying the parties of material breaches and terminating the Software License Agreement, and protections to ensure the software would be used only by the licensee and authorized end users.

7.     Plaintiff is informed and believes and thereon alleges the following:  Upon executing the Software License Agreement and as memorialized therein, during the term of the Software License Agreement, plaintiff RSW's licensed software became an integral and inseparable component of EMTEK's Clinical Information Management System, which included its Continuum 2000 product.  EMTEK's products included wireless systems and workstations.  EMTEK had customers in the U.S., Canada, Europe, Asia, and Australia and New Zealand.

8.     In the years before the Software License Agreement was executed in 1993, EMTEK had paid Plaintiff RSW a total of $51,976 in license fees.

- 3 -

9.      On or about October 10, 1995, the Software License Agreement was amended to provide Plaintiff RSW with payment for providing support for a Kanji version of the plaintiff's licensed software to be used for EMTEK Clinical Information Management System installations in Japan, with all the terms and conditions of the original agreement to remain the same.  A copy of the amendment is attached as Exhibit B and is incorporated herein by this reference.

10.      Between February of 1993 and January of 1998, EMTEK reported sales subject to the Software License Agreement and paid a total of $171,120 to Plaintiff RSW in license fees.

11.      On or about January 20, 1998, the domestic operations of EMTEK were acquired by Defendant ECLIPSYS from Motorola, and the Software License Agreement was assigned to Defendant ECLIPSYS.  A copy of the executed assignment is attached as Exhibit C and incorporated herein by this reference.  Under the terms of the assignment, Defendant ECLIPSYS agreed to assume EMTEK's contractual responsibilities to plaintiff, and Defendant ECLIPSYS became EMTEK's successor-in-interest with respect to the Software License Agreement.

12.      Plaintiff is informed and believes and thereon alleges the following:  Defendant ECLIPSYS entered into an agreement with Motorola at the same time to provide support to EMTEK's international customers; in addition, Defendant ECLIPSYS entered into separate remarketing agreements for EMTEK's customers in Japan and Germany.

13.      Plaintiff alleges that defendants, and each of them, breached the terms of the Software License Agreement by failing to report sales and pay license fees required under the Software License Agreement.  Section II.A. of the Software License Agreement required monthly accountings and payment of license fees.  Instead of monthly accountings, plaintiff received four reports from Defendant ECLIPSYS in 1998, one in 1999, none in 2000,  none in 2001, one in 2002, none in 2003, one in 2004, and none in 2005.

FIRST AMENDED COMPLAINT

Case No. C05-03127 JW
First Amended Complaint

14.     Plaintiff alleges that Defendant ECLIPSYS breached the terms of the Software License Agreement by failing to pay license fees on all workstations covered by the Software License Agreement. Section II.A. of the Software License Agreement requires the licensee to pay plaintiff license fees for "all workstations that are part of each and every system sold, furnished, given away or distributed in any manner whatsoever." Defendant ECLIPSYS, as successor-in-interest to EMTEK, owes license fees for all workstations that are part of each clinical information management system covered by the Software License Agreement. The records necessary to determine the amount of license fees owed to plaintiff lie within the exclusive control of Defendant ECLIPSYS.

15.     Plaintiff is informed and believes and thereon alleges that since acquiring EMTEK and its approximately 60 customers in 1998, Defendant ECLIPSYS' customer base has grown to approximately 1,500 customers.

16.     Plaintiff is informed and believes and thereon alleges the following:   Defendant ECLIPSYS successfully integrated EMTEK's products and technology into its line of clinical information management and critical care software applications. Taking advantage of EMTEK's name recognition and good reputation, Defendant ECLIPSYS continued using the EMTEK and "Continuum 2000" nomenclature in its own product line for years. Defendant ECLIPSYS has incorporated the technology acquired from EMTEK in its new products, of which a clinical information management system is a key component. The records necessary to determine which products are currently covered by the Software License Agreement lie within the exclusive control of Defendant ECLIPSYS.

17.     Plaintiff alleges that Defendant ECLIPSYS breached the Software License Agreement by failing to pay plaintiff license fees on many thousands of workstations using the

- 5 -

licensed software.  When plaintiff questioned the 2002 accounting figures, Defendant ECLIPSYS'
general counsel falsely wrote that plaintiff's software was "embedded" only in Defendant
ECLIPSYS' Sunrise Critical Care product.  In correspondence to Mr. Schaffer in March of 2005,
Defendant ECLIPSYS' general counsel falsely wrote that, "Eclipsys has used the Revolutionary
software in the context of its Sunrise Critical Care product, which Eclipsys has not sold since 1999."
Business reports, trade journals, and newspapers report many customers using Defendant
ECLIPSYS' Continuum 2000 product, its Sunrise Critical Care product, and the Sunrise Clinical
Manager Suite, specifically containing the Critical Care component, between 1998 and 2005.
Exhibit A to the Software License Agreement requires the licensee to "install the '/rdb' product in
each clinical workstation distributed to its customer base as per the terms of this Agreement."
Defendant ECLIPSYS' most recent accounting to Plaintiff RSW, in August 2004, confirmed sales
subject to the Software license Agreement and paid license fees of $5,710 for such sales between
July 2002 and August 2004.  Defendant ECLIPSYS continues to sell and support clinical
information management systems subject to the Software License Agreement.

18.     At no time between January of 1998 and June of 2005 did Defendant ECLIPSYS
terminate or repudiate the Software License Agreement.

19.     Plaintiff alleges that Defendant ECLIPSYS breached the Software License
Agreement by unilaterally changing the definition of units to be counted for purposes of calculating
license fees.  In the "Recitations" section of the Software License Agreement, the parties agreed:

"Each System consists of a number of computers.  During the term of this Agreement,
every workstation that is part of every System will be subject to this License
Agreement and license fees shall be payable whether such computers are provided by
EMTEK [Eclipsys] or by any other party."

- 6 -

1    and

2    "System means 'EMTEK's Clinical Information Management System,

3    which is comprised of EMTEK's software and the Licensed Software.'"

4    The parties deliberately chose workstations as the basis for license fee payments after pre-contract

5    negotiations, at the insistence of EMTEK. The June 2002 accounting provided by Defendant

6    ECLIPSYS to Plaintiff RSW counts "number of SCC UNIX hosts" rather than "workstations." The

7    report contains a notation: "Workstations are equivalent to UNIX servers." This language does not

8    appear in the Software License Agreement. The report also makes a retroactive adjustment to the

9    2000 report, with an explanation that, "Workstation was erroneously interpreted as actual desktops

10   rather than UNIX boxes." This modification of the Software License Agreement, not agreed to in

11   writing as required by Section XXV., resulted in a substantial under-counting of workstations

12   stipulated under the Software License Agreement to be subject to license fees.

13

14

15        20.    Documents published by Defendant ECLIPSYS and others indicate that Defendant

16   ECLIPSYS serves approximately 1,500 customers with 500,000 clinical users worldwide. Since

17   acquiring EMTEK in early 1998, Defendant ECLIPSYS has paid plaintiff license fees of at least

18   $55,950.

19

20        21.    Plaintiff is informed and believes and thereon alleges that Defendant ECLIPSYS

21   breached the Software License Agreement by omitting license fees for workstations provided to

22   thousands of customers in the U.S., Canada, Europe, and Asia from the royalty accountings provided

23   to plaintiff. The records necessary to determine the amount of license fees owed to Plaintiff lie

24   within the exclusive control of Defendant ECLIPSYS.

25

26        a.    In 2001, Defendant ECLIPSYS sold its foreign subsidiaries, Eclipsys Limited

27   and Eclipsys Australia Pty Limited, to iSOFT Group Limited (hereinafter "iSOFT"), a

28

- 7 -

European-based software developer and provider of health care technology. Plaintiff

discovered through its own investigations that iSOFT's marketing materials speak of

hundreds of thousands of users in the United Kingdom, Europe, Hong Kong, Singapore,

Australia, and New Zealand, including 44,000 workstations used in the national British

healthcare system alone. Defendant ECLIPSYS' June 2002 accounting to Plaintiff RSW

shows license fees of $60 (sixty dollars) paid for two "SCC UNIX hosts" supplied to iSOFT.

Defendant ECLIPSYS failed to account for and pay license fees for hundreds of thousands of

workstations supplied to customers in foreign countries since 1998.

        b.    Plaintiff is informed and believes and thereon alleges that Defendant

ECLIPSYS provides support and service to EMTEK's customers in Japan, Germany, and

other countries. Since 1998, only one Canadian customer was identified on a royalty report,

license fees of $30 (thirty dollars) paid for one "SCC UNIX host" supplied to Siemens; many

customers in other countries were omitted. Defendant ECLIPSYS owes license fees on

unreported workstations covered by the Software License Agreement supplied to these

customers.

        c.    Plaintiff is informed and believes and thereon alleges that Defendant

ECLIPSYS omitted thousands of workstations supplied to customers in the U.S. and foreign

countries from its accountings. Since January 2005, plaintiff has discovered substantial

discrepancies between the numbers reported by Defendant ECLIPSYS and the number of

customers actually using Defendant ECLIPSYS products subject to license fees.

22.    Plaintiff alleges that Defendant ECLIPSYS breached the Software License

Agreement by refusing to allow an audit to resolve the accounting disputes. Section II.C. of the

Software License Agreement gives plaintiff the right to an annual audit of Defendant ECLIPSYS'

- 8 -

records.  With questions about the most recent (August 2004) accounting and earlier unresolved issues, Mr. Schaffer wrote to Mr. Robert Colletti, Defendant ECLIPSYS' chief financial officer, on January 14 and February 8, 2005, explaining Plaintiff RSW's concerns and informing him that Plaintiff RSW wanted to exercise its right to an audit.  Receiving no response from Mr. Colletti, Mr. Schaffer wrote to Mr. Paul Ruflin, Defendant ECLIPSYS' president and chief executive officer, on March 1, 2005, notifying Defendant ECLIPSYS of a material breach and again requesting cooperation with an audit.  When Defendant ECLIPSYS' general counsel contacted Mr. Schaffer in response to his letters to Mr. Ruflin, Mr. Schaffer made the same requests to Defendant ECLIPSYS' general counsel.  Plaintiff's requests for an audit have not been granted.  The records necessary to determine the amount of license fees owed to plaintiff lie within the exclusive control of Defendant ECLIPSYS.

23.     Plaintiff alleges that Defendant ECLIPSYS breached the Software License Agreement by its failure to pay late charges incurred in September, 2004.  Section II.D. of the Software License Agreement requires the licensee to pay late charges on any amounts invoiced but not paid within 30 days.  Defendant ECLIPSYS failed to pay Plaintiff RSW's August 17 invoice for the sales reported on the August 2004 report within 30 days.  On  September 27, 2004, Plaintiff RSW billed for $89.55 in late charges.  On or about November 2, 2004, Defendant ECLIPSYS' assistant controller responded in writing and refused to pay the late charges, indicating it was not Defendant ECLIPSYS' policy to pay interest on invoices.  Mr. Schaffer brought the issue to the attention of Mr. Colletti in January and February of 2005, and to Mr. Ruflin's attention in March, 2005.  Defendant ECLIPSYS continues to refuse to pay the $89.55 in late charges.

24.     Plaintiff alleges that defendants, and each of them, breached the Software License Agreement by violating the escrow provisions, permitting unauthorized persons to gain access to the

- 9 -

source code, and disclosing confidential information . Section XV. of the Software License Agreement stipulates that the source code for Plaintiff RSW's licensed software is to be kept in an escrow account, with written documentation required for access.  Section XIII. requires the licensee not to disclose confidential information.

25.    Plaintiff alleges that defendants breached the Software Deposit Agreement between Plaintiff RSW as licensor, Defendant ECLIPSYS, as successor-in-interest to EMTEK, as licensee, and Brambles NSD, Inc., as escrow agent, a copy of which is attached as Exhibit D and incorporated herein by this reference, by failing to pay charges for escrow services.

26.    Plaintiff is informed and believes and thereon alleges the following:  Defendant obtained the source code from DSI Technology Escrow Services, Inc. (hereinafter "DSI"),  a subsidiary of Iron Mountain Company, sometime in 2002 or earlier.  Defendant ECLIPSYS instructed DSI to release the source code to Defendant ECLIPSYS employees without proper documentation or notice to plaintiff.  After plaintiff's former attorney brought the issue to Defendant ECLIPSYS' attention, Defendant ECLIPSYS' general counsel confirmed in writing that the source code had been so obtained and referred plaintiff to DSI for further information. When plaintiff contacted DSI requesting copies of the escrow account records, logs, and documentation, DSI refused to provide any records whatsoever, stating in writing that Plaintiff RSW was "not a party to the agreement," and referred plaintiff to Defendant ECLIPSYS' general counsel.

27.    Plaintiff is informed and believes and thereon alleges that defendants, and each of them, breached the Software License Agreement by rewriting and modifying plaintiff's software without plaintiff's consent.   Sections I.B. and X.B. prohibit any "changes, modifications, or additions" to the software.  Plaintiff alleges that defendants, and each of them, also breached Section XXIII.B. which prohibits "independent development or marketing of software similar to the

- 10 -

Licensed Software" without prompt notification to plaintiff of such intention and actions. Plaintiff is informed and believes and thereon alleges that defendants, and each of them, directed employees and consultants to rewrite plaintiff's software for Defendant ECLIPSYS' products. In an article appearing in the May 18, 2004 issue of the .NET Developer's Journal and republished on Defendant ECLIPSYS' Internet site, John Gomez, Defendant ECLIPSYS' chief technology officer, was quoted as saying:

> "Our clinical documentation system is a rewrite of our Sunrise Critical Care
> system, which was an AIX platform and is now 100% .NET. The original system
> took years to write. With .NET we wrote it from the ground up in a little over a year
> and added more features and functionality than the original system. The product is
> set to ship in June."

Defendant ECLIPSYS never obtained plaintiff's consent to change the licensed software, nor did Defendant ECLIPSYS notify plaintiff of its development activities, as required by the Software License Agreement. The records necessary to determine whether the licensed software was modified or rewritten lie within the exclusive control of Defendant ECLIPSYS.

     28.    Plaintiff is informed and believes and thereon alleges that defendants, and each of them, breached the Software License Agreement by selling plaintiff's copyrighted software to unauthorized end users, contrary to Section X.E. of the Software License Agreement. In March of 2005, plaintiff discovered that sometime in 2001, Defendant ECLIPSYS sold its foreign subsidiaries, Eclipsys Limited and Eclipsys Australia Pty. Limited, to iSOFT. The transaction included sale of Defendant ECLIPSYS' software and intellectual property, including Plaintiff RSW's licensed and copyrighted software. Plaintiff is informed and believes and thereon alleges that Defendant

FIRST AMENDED COMPLAINT

Case No. C05-03127 JW
First Amended Complaint

ECLIPSYS received approximately $14 million for the sale of its operations in Europe, Asia, Australia, and New Zealand to iSOFT.

29.     Plaintiff is informed and believes and thereon alleges that defendants, and each of them, breached the Software License Agreement by failing to maintain end user sublicenses, as required under Section I.A.2.  In its letter terminating the Software License Agreement with Defendant ECLIPSYS on June 3, 2005, plaintiff instructed Defendant ECLIPSYS to produce valid end user license agreements for all authorized end users.  Defendant ECLIPSYS continues to refuse to produce these agreements as required by the Software License Agreement.

30.     Plaintiff alleges that defendants, and each of them, breached the Software License Agreement by failing to protect plaintiff's software from infringement by others.  Despite the instructions in plaintiff's June 3, 2005 letter terminating the Software License Agreement, Defendant ECLIPSYS failed to return all copies of the software, documentation, and proprietary material and failed to instruct the escrow agent to return the source code to plaintiff.

31.     Plaintiff has performed all contractual duties and obligations required of licensor under the Software License Agreement.

32.     Plaintiff followed the dispute resolution process set forth in Section XIII. of the Software License Agreement.  Between 2002 and March of 2005, Plaintiff RSW's president and Plaintiff RSW's former attorney sent numerous emails and letters asking Defendant ECLIPSYS to provide monthly reports, explain the escrow violation, clarify the accounting methods and units, pay late fees, and allow plaintiff to conduct an audit, as provided in the Software License Agreement.  Each letter identified the specific accounting issues being questioned and requested Defendant ECLIPSYS' cooperation in resolving the dispute.  Plaintiff notified Defendant ECLIPSYS' chief financial officer and president in the form and manner prescribed by the Software License

- 12 -

Agreement. Defendant ECLIPSYS' failure to respond made any face-to-face meeting impossible to arrange.

33.    Plaintiff has fulfilled all other termination obligations under Sections III.C. and XIII. of the Software License Agreement. On or about March 1, 2005, Mr. Schaffer wrote to Mr. Ruflin, Defendant ECLIPSYS' president and chief executive officer, notifying him that Plaintiff RSW considered Defendant ECLIPSYS in material breach of the Software License Agreement and specifying the specific issues of concern. On or about June 3, 2005, Mr. Schaffer notified Defendant ECLIPSYS that the Software License Agreement was terminated due to Defendant ECLIPSYS' failure to correct the material breaches within the 90-day period beginning March 1, 2005. Mr. Schaffer's letter instructed Defendant ECLIPSYS to provide royalty accountings and pay license fees, return its software and other property, and cease using all products containing derivatives of the EMTEK product, of which plaintiff's licensed software was an integral and inseparable part. Defendant ECLIPSYS failed to perform these contractual obligations.

34.    As a result of defendants' breach of the Software License Agreement, plaintiff suffered damages of :

    a.    License fees of at least $15 million for workstations supplied to U.S. and foreign  customers that were not reported;

    b.    Compensation for unauthorized sales and sublicenses;

    c.    Costs of suit.

WHEREFORE, plaintiff requests judgment against defendants, and each of them, as hereinafter set forth.

//

//

- 13 -

FIRST AMENDED COMPLAINT

## SECOND CAUSE OF ACTION:  BREACH OF COVENANT
## OF GOOD FAITH AND FAIR DEALING

35.     Plaintiff incorporates each and every allegation in Paragraphs 1 through 34, above, and repeats and realleges such allegations hereinafter.

36.     Plaintiff and EMTEK entered into a written Software License Agreement, to which Defendant ECLIPSYS became EMTEK's successor-in-interest (see Exhibits A, B, and C) . Defendant ECLIPSYS also became EMTEK's successor-in-interest with respect to a written Software Deposit Agreement (see Exhibit D).

37.     Plaintiff performed all of its obligations required under the Software License Agreement.

38.     All conditions for defendants' performance had occurred.

39.     Defendants, and each of them, unfairly interfered with plaintiff's right to receive the benefits of the Software License Agreement.  Defendant ECLIPSYS unilaterally changed the Software License Agreement definition of workstations subject to license fees, failed to provide plaintiff with monthly royalty accountings, failed to report and pay license fees on thousands of workstations subject to license fees, failed to obtain plaintiff's consent before rewriting and changing the software, and failed to notify plaintiff of its intentions and actions regarding independent software development .  Defendants' employees refused to provide accounting information, refused to cooperate to resolve accounting disputes, refused to provide documentation regarding employees' access to the source code, refused to return the source code and other proprietary materials belonging to plaintiff, and denied plaintiff an opportunity to conduct an audit to resolve accounting issues. Plaintiff in good faith followed the dispute resolution steps set out in the Software License Agreement, but Defendant ECLIPSYS did not.

- 14 -

40.   Plaintiff was harmed by defendants' conduct.

41.   As a result of defendants' conduct, plaintiff suffered damages of at least $15 million in lost license fee revenues, compensation for unauthorized sales and sublicenses, and costs of suit.

WHEREFORE, plaintiff requests judgment against defendants, and each of them, as hereinafter set forth.

## THIRD CAUSE OF ACTION:   COMMON COUNTS

42.   Plaintiff incorporates each and every allegation in Paragraphs 1 through 41, above, and repeats and realleges such allegations hereinafter.

43.   Plaintiff alleges that Defendant ECLIPSYS became indebted to plaintiff within the last four years for money had and received by defendants for the use and benefit of plaintiff and for work, labor, services and materials rendered at the special instance and request of defendants and for which defendants promised to pay plaintiff the sum of $30 for each workstation.

44.   $15 million, which is the reasonable value of the amount owed, is due and unpaid despite plaintiff's demand, plus prejudgment interest at the rate of 10 percent per year from June 9, 2005.

WHEREFORE, plaintiff requests judgment against defendants, and each of them, as hereinafter set forth.

## FOURTH CAUSE OF ACTION:
## CONVERSION AND MISAPPROPRIATION

45.   Plaintiff incorporates each and every allegation in Paragraphs 1 through 41, above, and repeats and realleges such allegations hereinafter.

46.   On or about January of 2000, plaintiff owned certain personal property consisting of computer storage media containing the source code for its copyrighted software, "/rdb."

- 15 -

47.     On or about January of 2000, the property described in Paragraph 46 had a reasonable fair market value estimated at $7.5 million.

48.     Plaintiff's source code had not been disclosed, distributed, or revealed to the public or other publishers in the industry.  Plaintiff's source code was stored in a secured escrow account, pursuant to the terms of the Software Deposit Agreement (see Exhibit D).

49.     Plaintiff is informed and believes and thereon alleges that defendants, and each of them, converted and misappropriated the confidential and proprietary property of plaintiff described in Paragraph 46 by improperly and deceptively obtaining access to the source code without plaintiff's prior knowledge or consent and allowing employees of Defendant ECLIPSYS to access the proprietary source code and provide access to the source code to others.  Defendants, and each of them, have refused to return the source code to plaintiff and have failed to comply with plaintiff's request to provide information and documentation regarding the circumstances of the access obtained.  Defendant ECLIPSYS instructed escrow agent Recall NCC Group (formerly Brambles NSD) not to release the source code to Plaintiff.

50.     Plaintiff is informed and believes and thereon alleges that Defendant ECLIPSYS used plaintiff's copyrighted software in its own products, allowed others to use plaintiff's copyrighted software in their products without plaintiff's consent, and sold and sublicensed versions of the licensed software to Nippon Motorola, Ltd., Siemens, Singapore Health, and other entities.

51.     On or about May 29, 2001, Defendant ECLIPSYS sold its foreign subsidiaries, Eclipsys Limited and Eclipsys Australia Pty Limited, to a European company, iSOFT, along with intellectual property rights, source code,  and rights to distribute Defendant ECLIPSYS' products containing plaintiff's licensed, copyrighted software to customers in the United Kingdom, Europe, Hong Kong, Australia, and New Zealand.  Plaintiff is informed and  believes and thereon alleges that

- 16 -

Defendant ECLIPSYS gained approximately $14 million in this transaction.

52.    iSOFT's marketing materials and Internet site refer to a customer base of 44,000 workstations in the United Kingdom alone.  Plaintiff is informed and believes and thereon alleges that iSOFT has supplied thousands of additional workstations to its customers in Europe, Asia, Australia, and New Zealand.

53.    After the licensed software was transferred to iSOFT,  both Defendant ECLIPSYS and iSOFT issued press releases announcing formation of  "strategic partnership" relationships with other companies, contrary to the terms of the Software License Agreement.  Plaintiff is informed and believes and thereon alleges that Defendant ECLIPSYS shared the licensed software with unauthorized users such as Microsoft, CareFX, HealthVision, and others.

54.    Plaintiff was informed by Defendant ECLIPSYS that employees of Defendant ECLIPSYS and DSI employees had gained access to the source code in March 2002 or earlier.  Defendant ECLIPSYS' general counsel represented to RSW contemporaneously that this access was not improper.  Plaintiff was not aware of defendants' conversion and misappropriation until notified by DSI on October 31, 2005 that Plaintiff RSW was not a party to any escrow agreement with DSI and Defendant ECLIPSYS, contrary to Defendant ECLIPSYS' indications in 2002 when its general counsel identified the contact person at DSI who was handling the account.  Until March of 2005, plaintiff depended and relied upon the contractual remedy of an audit to resolve questions about Defendant ECLIPSYS' royalty accountings.  After Defendant ECLIPSYS failed to grant plaintiff's request for an audit and failed to provide royalty accountings in March of 2005, plaintiff undertook investigations of its own to determine what Defendant ECLIPSYS' products were and to whom they were supplied.  It was only during these investigations that plaintiff discovered the existence and nature of iSOFT, Siemens, and Defendant ECLIPSYS' other strategic partners.  Defendant

- 17 -

ECLIPSYS concealed the identity of most of these entities by failing to report them fully on royalty reports. In the case of iSOFT, Defendant ECLIPSYS paid license fees of $60 (sixty dollars) for two "SCC UNIX hosts"; in the case of Siemens, Defendant ECLIPSYS paid license fees of $30 (thirty dollars) for one "SCC UNIX host," and no license fees were reported for any other entity.

55.     Since discovering defendants' conversion and misappropriation, plaintiff has expended considerable time and money pursuing return of its property, including the costs of this lawsuit and attorney fees.

WHEREFORE, plaintiff requests judgment against defendants, and each of them, as follows:

1.     Compensatory damages of $15 million for license fees due on workstations supplied to customers in U.S. and foreign countries.

2.     An accounting to identify additional royalty fees due;

3.     Additional compensatory damages at the rate of $30 per workstation for royalties identified in the accounting;

4.     Costs of the accounting;

5.     Compensation for unauthorized sales and sublicenses;

6.     Termination of Software License Agreement;

7.     Prejudgment interest on the compensatory damages at the rate of 10 percent from the date of June 9, 2005;

8.     Damages of $7.5 million for the value of plaintiff's property at the time of conversion and misappropriation;

9.     Prejudgment interest on the value of the converted and misappropriated property, pursuant to Civil Code Section 3336, at the rate of 10 percent from January, 2000;

- 18 -

1    10.    Reimbursement for the costs of this lawsuit and attorney fees, pursuant to Civil Code

2           Section 3336;

3    11.    Other damages according to proof;

4    12.    A permanent order enjoining defendants from destroying, disposing of, disclosing, or

5           using any of plaintiff's property;

6

7    13.    An order requiring defendants to return to plaintiff all of plaintiff's property in their

8           possessions;

9    14.    Costs of this action; and

10   15.    Any alternative or additional relief as may be just and proper.

11

12

13   Dated: September 8, 2006                      *Cynthia M. Judy*

14                                                 CYNTHIA M. JUDY
                                                   Attorney for Plaintiff
15

16

17

18

19

20

21

22

23

24

25

26

27

28

- 19 -

FIRST AMENDED COMPLAINT                          Case No. C05-03127 JW
                                                 First Amended Complaint