# GIBSON, DUNN & CRUTCHER LLP

LAWYERS

A REGISTERED LIMITED LIABILITY PARTNERSHIP
INCLUDING PROFESSIONAL CORPORATIONS

1881 Page Mill Road  Palo Alto, California 94304
(650) 849-5300
www.gibsondunn.com

MBSmith@gibsondunn.com

October 26, 2006

Direct Dial
(650) 849-5338
Fax No.
(650) 849-5038

Client No.
T 26534-00002

### VIA ELECTRONIC FILING AND HAND DELIVERY

Hon. James Ware
United States District Court for the
      Northern District of California
280 N. 1st Street,  Courtroom 8, 4th Floor
San Jose, California  95113

      Re:    *Revolutionary Software, Inc. v. Eclipsys Corporation,*
            *Case No. C05-03127 JW*

Dear Judge Ware:

      We write on behalf of our client, defendant Eclipsys Corporation ("Eclipsys"), pursuant to the Court's Order after Hearing dated October 16, 2006, to nominate individuals for a potential Special Master position to assist the Court with the technical aspect of this case. Eclipsys respectfully nominates the following individuals, each of whom Eclipsys believes is qualified to serve as a Special Master in this case:

      **Dr. A. J. "Nick" Nichols**.  Dr. Nichols has a Ph.D. in electrical engineering from Stanford University, an M.S in electrical engineering from Stanford, and B.S degrees in both business management and electrical engineering from the University of Colorado, Boulder.  He has served as a neutral expert in numerous cases, including the *In re Napster* and *Cadence Design Systems v. Avant!* cases before this Court.  For the Court's convenient reference, we have enclosed biographical and other information about Dr. Nichols obtained from the website of his consulting company, Probitas (www.probitas.com).

      **Dr. Stephen Melvin**.  Dr. Melvin has a Ph.D. in Computer Science from the University of California at Berkeley, and is a registered Patent Agent.  Dr. Melvin served as a court-appointed expert in the *Cadence Design Systems v. Avant!* case before this Court, and has served as a software analysis experts in numerous lawsuits.  For the Court's convenient reference, we

**GIBSON, DUNN & CRUTCHER LLP**

Hon. James Ware
October 26, 2006
Page 2

have enclosed biographical and other information about Dr. Melvin obtained from the website of his consulting company, Zytek Communications (www.zytek.com).

**Dr. Lee A. Hollaar.** Dr. Hollaar is a professor in the School of Computing at the University of Utah in Salt Lake City. Dr. Hollaar has a Ph.D. in computer science from the University of Illinois at Urbana-Champaign, and a B.S. in electrical engineering from the Illinois Institute of Technology. Dr. Hollaar has taught a variety of software and hardware courses over the past 25 years, and has been a technical expert or consultant in a number of patent and antitrust cases. For the Court's convenient reference, we have enclosed biographical and other information about Dr. Hollaar obtained from the website of the University of Utah School of Computing (www.cs.utah.edu/~hollaar/), including a copy of Dr. Hollaar's article, "The Use of Neutral Experts," published in BNA's *Expert Evidence Report* on December 20, 2004.

Pursuant to this Court's direction, neither Eclipsys nor its counsel have contacted or attempted to contact any of the above individuals in connection with this case. Eclipsys also believes that the continued involvement of **Richard Abramson**, the Court-appointed mediator in this case, either as a neutral or as a Special Master, would promote the just, speedy, and inexpensive determination of this action. After presiding over a six-month mediation that involved substantial discovery, Mr. Abramson is very familiar with the facts and issues in this case, and has significant experience in cases involving technical software issues.

Respectfully,

Michael B. Smith

Enclosure(s)

cc:   Timothy Volkmann, Esq. (via electronic service)
      Cynthia Judy, Esq. (via electronic service)

100101759_1.DOC

# PROBITAS

## Expertise in Computer Technology

**Probitas provides computer technology expertise in high-technology litigation, arbitration, mediation and other consulting roles**

The company has provided computer development and consulting services to electronics and computer firms since 1981 and has extensive experience in design, development, and technical management. The Probitas development emphasis has been on communications, embedded systems, enhancements to operating systems (such as device drivers), and digital design and analysis.

This hands-on experience is valuable in serving as a neutral expert, expert witness, arbitrator and mediator for intellectual property cases involving a broad spectrum of computer technology. Matters have included patent infringement, copyright issues, and misappropriation of trade secrets. Probitas also has forensic tools for analyzing hard disks and recovering data from them.

Probitas has a well-established reputation for work of the highest quality, providing thorough analyses, meeting commitments, and understanding the needs of its clients.

*Probitas Corporation has no relationship whatsoever with Probitas Partners of San Francisco or its affiliated entities.*

Last updated September 15, 2004

# A. J. Nichols, Ph.D.

## Computer Technology Expert, Mediator, Arbitrator



**A. J. "Nick" NICHOLS** provides services as a computer technical expert in all aspects of litigation, pre-litigation evaluation, mediation, trial and arbitration. Dr. Nichols has also served as a neutral technology expert to judges of United States District Courts; the Supreme Court of Singapore; the Superior Courts of San Francisco, Santa Clara, and San Diego Counties; to JAMS neutrals; and directly to the parties involved.

Dr. Nichols serves as an arbitrator and mediator for the American Arbitration Association and the UN's World Intellectual Property Organization in Geneva. He is on the mediation panels of the Northern District of California, the First Appellate District of the California Court of Appeals and the Peninsula Conflict Resolution Center in San Mateo, California. He obtained his mediation training at Harvard Law School and through the organizations for which he mediates.

In acting as a neutral expert, Dr. Nichols has:
- assisted judges in their understanding of revelant technology
- worked with judges to explain technical documents, expert reports and technical references in contracts
- reviewed orders for technical accuracy
- monitored compliance with court orders regarding technology issues
- performed forensic analysis of disk drives, including restoration of deleted documents
- examined computer programs for evidence of misappropriation and other malfeasance
- written reports on the above

Among the 16 cases in which he has assisted as a neutral expert are *In re Napster* (Honorable Marilyn Hall Patel), *Cisco v. Huawei* (the parties themselves), *Sun Microsystems v. Microsoft* and *Cadence Design Systems v. Avant!* (Honorable Ronald M. Whyte), *Creative Technology v. Aztech Systems* (Supreme Court of Singapore), and a mediation of the dissolution of a software company (Honorable Charles A. Legge (retired), JAMS).

Dr. Nichols has acted as an expert witness or consultant for plaintiffs and defendants in over 50 litigation matters involving patents, trade secret misappropriation, copyright infringement, and design defects. The technologies involved both hardware and software across the breadth of the computer field. Examples include modems, peer-to-peer communications, laser eye surgery software, disk drives, web page design, BIOS operation, data communications, electronic games, networks, image rendering, logic design, and clean room setup.

His education includes a Ph.D. in Electrical Engineering from Stanford University, an M.S in EE from Stanford, and B.S degrees in both Business Management and Electrical Engineering from the University of Colorado, Boulder.

Dr. Nichols has a broad background in the engineering of computer hardware and software. He served as an engineering executive, developer, and researcher for Millennium Systems, Intel Corporation, American Microsystems, Novar Corporation, and Lockheed Missiles & Space

Company. In 1981 he founded a firm that provides consulting and product development assistance to high technology companies. He has served as president of Probitas since its inception.

Probitas Home

Last updated June 16, 2006

# A. J. NICHOLS

# SERVICE AS A NEUTRAL EXPERT

| Time Period | Reporting to | Case | Counsel for First Party | Counsel for Second Party |
|---|---|---|---|---|
| January 2006 to Date | The parties themselves | Decision Insights, Inc. v. Sentia Group, Inc. | Nicholas Hantzes, Esq. Hantzes & Reiter Vienna, VA | Theodore A. Pianko, Esq. Gary Dukarich, Esq. Joel A. Kauth, Esq. Christie, Parker & Hale LLP Newport Beach, CA |
| December 2005 to May 2006 | Honorable Maria-Elena James U.S. District Court Northern District of California San Francisco, CA | Friskit, Inc. v. RealNetworks, Inc., et al. | Michael H. Baniak, Esq. Jeffrey A. Pine, Esq. Anuj K . Wadhwa, Esq. Baniak Pine & Gannon Chicago, IL<br><br>Francis Torrence, Esq. Seyfarth Shaw LLP San Francisco, CA | Charles K. Verhoeven, Esq. David S. Perlson, Esq. Deepak Gupta, Esq. Quinn Emanuel Urquhart, Esq. Evette D. Pennypacker, Esq. Quinn Emanuel Urquhart Oliver & Hedges, LLP San Francisco, CA Redwood Shores, CA |
| March 2005 to July 2005 | The parties themselves | Possible misappropriation of trade secrets | Clark S. Stone, Esq. MacPherson, Kwok, Chen & Heid, LLP San Jose, CA | Ina Stangenes, Esq. Bergeson, LLP San Jose, CA |
| January 2005 to Date | Hon. Kevin E. Enright Superior Court of San Diego County, CA<br><br>Hon. Wayne Peterson (Retired) Special Master ADR Services San Diego, CA | Abacus America, Inc. v. Alabanza et. al. | Michael J. Hichman, Esq. Musick, Peeler & Garrett, LLP San Diego, CA<br><br>Daniel M. White, Esq. Steven G. Amundson, Esq. Beth J. Manover, Esq. White & Oliver, APC San Diego, CA | Karen S. Crawford, Esq. Patricia P. Hollenbeck, Esq. John P. Cooley, Esq. Duane Morris LLP San Diego, CA |
| August 2004 to December 2004 | The parties themselves | TRS Consultants, Inc. v. Elation Systems, et. al. | Melinda M. Morton, Esq. Bergeson, LLP San Jose, CA | David A. Priebe, Esq. Gray Cary Ware & Freidenrich East Palo Alto, CA |
| October 2003 to June 2004 | The parties themselves | Cisco Systems, Inc. and Cisco Technology, Inc. v. | | |

|  |  | Huawei Technologies Co., Ltd., Huawei America, Inc. and Futurewei Technologies, Inc. |  |  |
| --- | --- | --- | --- | --- |
| April 2003 to January 2004 | The parties themselves | SAT Corporation v. Zeta Technologies, Ltd., et. al. | David W. Goewey, Esq. Venable, Baetjer, Howard & Civiletti Washington, DC | Gary W. Johnson, Esq. Weston, Hurd, Fallon, Paisley & Howley Cleveland, OH |
| November 2002 to January 2004 | The parties themselves | Niku Corporation v. Business Engine Corporation | Carlyn Clause, Esq. Fenwick & West San Francisco, CA | James T. Fousekis, Esq. Robb A. Scott, Esq. Steinhart & Falconer (now Piper Rudnick) San Francisco, CA |
| March 2002 to June 2003 and October 2005 to May 2006 | Hon. John A. Flaherty, (Retired) JAMS Discovery Referee San Jose, CA | In Re Garth G. Conlan Revocable Living Trust | Steven W. Valdes, Esq. San Jose, CA Keith P. Bartell, Esq. Carr, McClellan, Ingersoll, Thompson & Horn Burlingame, CA Jeff Carchidi Timmerman & Cilley San Jose, CA | Dennis T. Rice, Esq. Howard Rice Nimerovsky Canady Falk & Rabkin San Francisco, CA William Faulkner, Esq. McMannis, Faulkner & Morgan San Jose, CA Robert C. Danneskiold, Esq. Ferrari Ottoboni San Jose, CA |
| January 2002 to April 2002 | Hon. Charles A. Legge, (Retired) JAMS Mediator San Francisco, CA | Private mediation involving dissolution of a software company | Marc P. Fairman, Esq Law Offices of Marc P. Fairman San Francisco, CA | Joseph Kouri, Esq. Bonnoni & Kouri Palo Alto, CA |
| April 2001 to February 2005 | Hon. Marilyn Hall Patel Chief Judge U.S. District Court Northern District of California San Francisco, CA | Various companies in the Recording Industry Association of America, various music publishers, and others v. Napster, Inc. | Russell J. Frackman, Esq. Mitchell Silberberg & Krupp LLP Los Angeles, CA | Robert B. Silver, Esq. Boies Schiller & Flexner LLP Armonk, NY Laurence F. Pulgram, Esq. Fenwick & West LLP San Francisco, CA Steven M. Cohen, Esq. Kronish Lieb Weiner & Hellman LLP New York, NY |
|  |  |  |  |  |

| | | | |
|---|---|---|---|
| August 2000 | Everett A. Hewlett, Jr. Discovery Commissioner San Francisco County Superior Court San Francisco, CA | McKesson HBOC, Inc. v. Terry Merrill, Michael Jansen, and Bindley Western Industries, Inc. | Tyree P. Jones, Jr., Esq. Interactive Law Group San Francisco, CA | Nancy Potter, Esq. Crosby, Heafey, Roach & May San Francisco, CA |
| August 1998 to January 2001 | Hon. Ronald M. Whyte Judge U.S. District Court Northern District of California San Jose, CA | Sun Microsystems, Inc. v. Microsoft Corporation | Lloyd R. Day, Jr., Esq. Day, Casebeer, Madrid, Winters & Batchelder, LLP Cupertino, CA<br><br>Janet L. Cullum, Esq. Cooley Godward, LLP Palo Alto, CA | Karl J. Quackenbush, Esq. Preston Gates & Ellis, LLP Seattle, WA<br><br>Terrence P. McMahon, Esq. Orrick, Herrington & Sutcliffe, LLP Menlo Park, CA<br><br>Allen Ruby, Esq. Ruby & Schofield San Jose, CA |
| Sept. 1996 to March 1997 | Hon. Ronald M. Whyte Judge U.S. District Court Northern District of California San Jose, CA | Cadence Design Systems, Inc. v. Avant!, Inc, et. al. | Michael H. Page, Esq. Keker & Van Nest San Francisco, CA | Daniel H. Bookin, Esq. Melveny & Meyers San Francisco, CA |
| June 1996 to Nov. 1996 | M. Karthigesu, Justice L. P. Thean, Justice Lai Kew Chai, Judge Supreme Court Singapore | Creative Technology, Ltd. v. Aztech Systems, Pte. Ltd. | Kevin Garnett, Q.C. London, England<br><br>Morris John Lim Yee Ming Drew & Napier Singapore | Peter Prescott, Q.C. London, England<br><br>Ng Soon Kai Ng, Chong & Hue Singapore |
| Oct. 1992 to Mar. 1993 | Hon. Lloyd E. Blanpied, Jr. (retired) JAMS Arbitrator San Diego, CA | Private arbitration involving misappropriation of software | | |

## Probitas Home

Last updated June 16, 2006

# Capabilities

## Neutral Expert

Probitas has served as a neutral expert in both domestic and international cases. Click here for details.

## Expert Witness

Probitas has worked on numerous cases involving trade secrets, patents, design quality, and copyright issues, both in the software and hardware fields. The technologies have included such areas as modems, laser eye surgery software, disk drives, web page design, BIOS operation, data communications, electronic games, networks, image rendering, logic design, and clean room setup.

## Mediator

Dr. Nichols serves on the mediation panels of the American Arbitration Association, the Northern District of California, the First Appellate District of the California Court of Appeals and the Peninsula Conflict Resolution Center in San Mateo, California. He has mediated more than a dozen cases involving computer software, neighbor disputes, property settlement and custody in divorce, and client/attorney relations. He trained in mediation at the Harvard Law School and with the organizations for which he mediates.

## Arbitrator

Dr. Nichols is on the Commercial Arbitrator Panel for the American Arbitration Association. He is an ideal panel member for large cases involving computer technology.

## Forensic Disk Drive Analysis

Probitas has developed a powerful set of tools for discovering and recovering data in "deleted" files on disk drives attached to Microsoft-based systems.

## Due Diligence

On several occasions Probitas has been called upon to evaluate system architectures, code quality, and engineering methodology during acquisition and licensing and venture funding negotiations.

## Product Development

Probitas currently provides only a limited amount of software and hardware development. However, David Simon, Michael Grischy and Richard Steinberg are still dedicated to software development of the highest quality. They are now at Octave Software.

Probitas Home

Last updated December 11, 2002



# IEEE SPECTRUM ONLINE

October 2001 | Volume 38 | Number 10          **Home >> Weekly Feature**

---

**● FEATURE ARTICLE**

# WEEKLY FEATURE

---

**○ PROFILE**

**He taught a federal judge how Java works, he dissected Sound Blaster for Singapore's Supreme Court, and now A. J. Nichols is up to his neck in Napster**

# Operating In Neutral

**By Tekla S. Perry, Senior Editor**



For a year now, the fortunes of Napster Inc. have risen and fallen to the beat of a judge's gavel. The on-line music-sharing service is being sued in the Northern District of California by a group of record labels, and as the suit progresses, Marilyn Hall Patel, the presiding U.S. District Judge, has issued several court orders requiring Napster to block copyrighted material. One even briefly shut the service down entirely. Still to come is a full trial, in which the Redwood City, Calif.based company could end up paying millions to record companies.

The Napster case is being closely watched, because its outcome will affect the long-term development of peer-to-peer technology, not only in the recording industry, but in the movie and publishing industries as well.

But Napster watchers rarely notice the one person, besides Judge Patel, who is pivotal in the case: A. J. ("Nick") Nichols.

An electrical engineer and long-time IEEE member, Nichols was appointed by the court in April as a neutral expert. This means that both sides of the case agreed that he could act as an advisor to the judge on the technical issues of the case. Typically, a neutral

expert does not testify in court; his or her conversations with the judge are private, which can bother some lawyers. The role is outlined in the U.S. Federal Judiciary Code's Rule of Evidence 706, which says, "The court may appoint expert witnesses of its own selection," and Rule of Civil Procedure 53, which says, "The court may appoint a special master....the word 'master' includes a referee, an auditor, an examiner, and an assessor."

The role of a neutral expert acting as a technical advisor, however, is not clearly codified. It can take several forms, including: a teacher with a class of one or two (the judge and/or the law clerk); a tutorial presenter, giving a lecture on the technology before a jury; or an independent investigator, whose analysis results in a written or oral report to the judge.

Neutral experts are of growing importance. With the complexity of today's technology, said U.S. District Court Judge Ronald M. Whyte, of the Northern District of California, "we judges certainly need ways to educate ourselves so we can make the right decision."

And Nichols, who has spent his 40-year career in computer, semiconductor, and circuit design, including the last 16 years as an expert witness in technical litigation, is recognized as one of the best neutral experts. Said Whyte: "Nick is constantly concerned with making sure that everything he does is above board and impartial. He is extremely careful not to express opinions on who is right or who is wrong; he doesn't advocate for a particular side, he just explains the technology."

"Nichols," said Ron Schulman, a partner at the law firm Wilson, Sonsini, Goodrich & Rosati, in Palo Alto, "is smart and does the work. You can trust that he has examined everything that he needs to examine before forming an opinion."

Cases can go on for a considerable time. Nichols was involved in *Sun* v. *Microsoft* Java infringement *case* for two and a half years. His involvement with the *Cadence* v. *Avant!* trade secrets case started in 1996 and is still going on. The work, however, is generally not continuous. There is usually a time in the beginning in which the expert must come up to speed. After that, he or she only helps only when the judge needs assistance. Long periods can go by without an expert doing anything and then something will happen (say, a hearing on a motion) that requires assistance. Most work by neutral experts, in particular, is before trial when the judge must deal with injunctions and motions.

In the Napster case, Nichols was asked by Judge Patel to look at the blocking technology being implemented by the music-sharing service to determine whether or not the company's engineers and computer scientists were doing everything they could to block works identified as copyrighted by the recording industry. At this writing, in early September, Napster's Web site has the following notice: "The ability to transfer files has been disabled. We're still fine-tuning our noticed-works filters and hope to begin testing them again soon."

Exactly what Nichols contributes to the case is up to the judge, and at this writing he would not discuss specifics, though he indicated his work on Napster has crowded his personal life. Recently Napster filed a brief with a U.S. appeals court complaining that Nichols' role has become too large, but at this writing no action had been taken on that brief.

## Shifting into neutral
Nichols' first service as a neutral expert began in 1992 in arbitration in San Diego, Calif., concerning the use of a company's source code. However, he had been appearing as an expert witness in technical cases since 1986. The judge in San Diego, stumped, wanted an independent expert to look at the code and give an opinion. Both sides submitted a list of names, and Nichols was listed by both. He was hired, analyzed the material, and wrote a report. "I have no idea to this day," he said, "what the decision was." Generally, rulings that

come out of arbitration are not made public.

Judges use neutral experts infrequently, so it was no surprise that four years passed before Nichols' next neutral case came up, in 1996. It was highly visible, pitting Creative Technology Ltd. against Aztech Systems Ltd., with Creative accusing Aztech of copying the firmware in Creative's Sound Blaster audio output cards for PCs. Creative originally filed suit in the United States, but, since both companies are based in Singapore, it was tried there, albeit with U.S. lawyers working behind the scenes with British and Singaporean counsel and with U.S. experts testifying.

The lower court that first heard the case found Aztech to be innocent. It was only when Creative appealed to the Singapore Supreme Court that Nichols was called in. "The justices wanted to have their own expert to help them," he said, "because they felt that it was important to get this right." After going through a 1.5-meter-high pile of documents, listening to the appeal, and meeting with the justices, Nichols wrote a report at the justices' request. The Supreme Court reversed the lower court's decision and found for Creative.

In the fall of 1996, before his work on *Creative v. Aztech* was complete, Nichols signed on as a neutral expert for the U.S. District Court for the Northern District of California in the case of *Cadence Design Systems* v. *Avant!,* in which Cadence Design Inc., in San Jose, Calif., charged Avant! Corp., in Fremont, Calif., with stealing source code for routing software. This summer, a separate criminal proceeding on this same matter was finally settled, with Avant! ordered to pay Cadence $182 million and some of Avant!'s executives sent to jail. Nichols, though, had nothing to do with the criminal case.

The civil case is still active. Nichols, though, worked on it only for several months. He stepped down from the case after disclosing a potential conflict: he was considering selling the consulting business he then owned, and he wanted to start negotiations with an engineer who was involved with the trial as an expert for Avant! But he ended up not going through with a sale at that time.

## Jumping into Java

In 1998, Nichols took on what was, until recently, his most visible case, *Sun Microsystems* v. *Microsoft*, in which Sun Microsystems Inc., in Palo Alto, alleged that Microsoft Corp., in Redmond, Wash., was abusing its license for Java technology and wanted it to stop. In this case, he spent most of his time making sure Judge Whyte understood how Java worked--what a virtual machine is, what an interpreter is, and what native code means, because one point being disputed was how Microsoft was accessing native code.

A pure Java program can run on any machine, with the machine-specific Java interpreter handling the translation. But some applications (such as those that directly control a device) require that machine-specific code be executed, and in that case the program bypasses the Java interpreter and calls routines in the machine language of the specific computer. Sun provided a mechanism in Java for software developers to do that; Microsoft's developers were ignoring that mechanism in favor of one they developed internally. Sun was concerned that if nonstandard forms of Java begin to proliferate, the portability of the open standard would be affected.

"He explained the basic concepts of Java," Whyte told *IEEE Spectrum*, "and would help me understand what each side was saying when it was talking about aspects of the technology."

What Nichols never said was whether or not he thought Microsoft was going outside the boundaries of its contract with Sun. "One of the first rules to remember as a neutral expert," he said, "is that you are not the judge. You don't tell judges how to decide the case. That is not your job. The decision will be based on the law and you don't know the law; you're not even a

lawyer, much less a judge."

Nichols feels strongly about this charge, though there are no legally binding guidelines for neutral experts. He has written a draft of such guidelines, which, he hopes, some day may be used by the courts.

"Those rules that he drafted are those that I follow generally," Judge Whyte told *Spectrum*. Whyte certainly feels that Nichols follows such rules himself. "I have no idea to this day if he felt that Sun's or Microsoft's arguments were stronger." The case was settled earlier this year, with Microsoft paying Sun some US $20 million.

## Twists and turns

A career as a judge's advisor was not a path Nichols sought out. Rather, he wandered into it, led by his personal strengths and weaknesses. He is considered smart and analytical, but has a hard time dealing with corporate hierarchies, whether as a manager or a subordinate.



BSEE and BS business degrees in hand from the University of Colorado, Nichols started his career in 1960 as a research scientist in the graduate study program at Lockheed Missiles & Space Co., Sunnyvale, Calif., where he initially was assigned to a project analyzing the characteristics of distributed analog circuits. He soon asked to be moved to a computer group, where he did research in switching theory and worked on database retrieval systems.

After nearly nine years at Lockheed and MS and PhD degrees in electrical engineering from Stanford, he began itching to move to a smaller company, where he could be involved in development that clearly led to a product, rather than simply to the publication of papers. He found a likely candidate through a newspaper advertisement, Novar Corp., in Palo Alto, and joined the founding group as director of systems development. Novar was developing a smart typewriter--an electrical typewriter with a tape drive to record data.

---

**A.J. Nichols has earned a reputation as a smart and extremely ethical expert witness.**

---

When the design he had taken over at Novar didn't work reliably, Nichols followed his standard operating procedure when faced with a technical problem: he "crawls into a hole," that is, he thinks about nothing but the problem until it is solved.

After a few weeks of avoiding phone calls, visitors, and as many distractions as possible, he completely redesigned the electronics for the product. This included a method of creating a

variable-length buffer, which earned him his first patent.

After Novar was sold in 1972 to GTE Information Systems, then in White Plains, N.Y., Nichols was quickly reminded why he disliked big companies. "It was frustrating to have a boss across the country, and to have to get five signatures before doing anything," he said. He soon left and joined semiconductor manufacturer American Microsystems Inc., then in Santa Clara, Calif., as director of engineering, where he was responsible for a microprocessor design group.

After getting on board, however, and checking out the activity in his group, Nichols made a tough decision--he killed off most of the projects. "That was hard," he told *Spectrum*. "Sometimes I think I'm too honest. But they were having a very hard time making the designs work, and even if they did get them to work, I didn't see a lot of market potential for the products."

The company ended up second-sourcing microprocessors from a Motorola Inc. group in Phoenix, Ariz., but, to Nichols' frustration, American Microsystems didn't support those products well. In 1975 he decided to leave for Intel Corp., Santa Clara, figuring that it would be nice to work for a company that despite its large size understood the microprocessor business.

As Intel's manager of applications engineering, Nichols' first task was to ensure that future chips better met customer needs. So he tied the 20 or so field engineers who worked with customers closely into the development process. He set up quarterly meetings between the design and field engineers and started a technical publications operation for the microprocessor group.

Then an opportunity Intel had with consumer electronics manufacturer Magnavox (now part of Royal Philips Electronics), prompted Nichols to crawl into a hole again. Magnavox was, in 1976, designing what was to be the successor to its first home video-game systems, and Intel wanted to provide the microprocessor. Nichols had roughed out a design for a peripheral chip that would improve the cost and performance of games.

He was scheduled to present this design to the Magnavox team on a Monday morning. But that Friday he realized that his design was fatally flawed. He shut himself off from the world Friday night. "I locked the door," Nichols explained, "unplugged the phone, and didn't talk to anybody. I didn't even get out of my pajamas." Monday morning he emerged with a new design. That was his second patent, for a video-game display circuit that handled the display of the moveable objects now called sprites.

He moved on to form an Intel group designing peripheral chips, and later took over a project to bring a test system for microprocessor-based systems to market. The test system didn't sell, the project was killed, and Nichols in 1978 moved to Millenium Systems Inc., in Cupertino, Calif., at that time, a company that made microprocessor-based design equipment. The job, vice president of engineering with some 53 people under him, was a step up, but it turned out to be a bad fit.

"I'm not good at being a subordinate or supervising other people on a day-to-day basis." He left Millenium about two years later, this time without another job to move into. He did have a job offer from the Datachecker division of National Semiconductor Corp., Santa Clara, again as a manager, supervising 125 people, but he turned it down.

Instead he took on some consulting work from the Datachecker group, which designed and manufactured point-of-sale systems, figuring that the consulting would tide him over until he found a job he really liked.

One of many projects he worked on for National was a supermarket scanner. At the time, the recognition process for bar codes was complicated and the Datachecker design required six printed-circuit boards. "I found a way of doing it, with fewer steps and put it into three chips. It

was a nice design--I should have patented it," he said.

Pretty soon, Nichols had several other clients, and a year later, he incorporated his consulting company as Probitas Corp., Mountain View, Calif.

"I didn't start off with the idea that I was going to be a consultant," Nichols said. "I said, 'I don't know what I'm going to do, but obviously I don't like management.' And what I found out is that the nicest thing about being a consultant is that you don't have to do management. I can do what I do best, which is making a contribution with my skills in technology."

While Nichols insists he never did become a manager again, he did add people to his consulting group. "The work just kept coming in, and suddenly I had a lot of it. So I brought more people on board. But I hired people who I knew would do good work without supervision."

Probitas eventually stabilized at about half a dozen people, doing, for the most part, design and technical troubleshooting. One other early project for National, for example, involved the computer system that runs cash register terminals. These systems worked in prototype and in initial manufacture, but later versions didn't work properly. Nichols was hired to find out why.

"It turned out," he said, "that whoever designed it didn't design it for the worst-case characteristics of the chips involved, only for the optimal ones. So if you got the right chips and they were fast enough, it would work. If you got chips that were slower, but met the specifications, it wouldn't." The problem had to do with the speeds of different circuit paths; if a certain path was faster than another one, the system failed. These problems, under the generic name of race conditions, generally occur because the signals on two or more circuit paths combine at some point. If the signals arrive with the wrong timing (the signal in one path gets there too late), a short signal spike can occur and cause a malfunction.


**"Buzzwords with Byte"**
Nichols was continuing to pursue this type of traditional consulting work, when, in 1985 or so, he was asked to handle a different kind of task, and his career path took an unexpected turn.

A woman account executive, working for an advertising agency with a number of high-tech companies as clients, asked for his help. "These guys come in," she told Nichols, "and we don't know what they are saying. We need some class or something to teach us what this stuff is about!" At her request, Nichols put together a two-evening seminar entitled "Buzzwords with Byte," at which he explained what the inside of a computer looks like, how a semiconductor device is built up from different layers, and a few other technology basics. He began giving the course regularly.

One day, an attorney who had taken his class invited him to speak at a computer law conference, giving an abbreviated form of his class. After he finished speaking, one of the lawyers in the audience approached him and asked, "Have you ever been an expert witness?"

"What's that?" Nichols responded. After the lawyer explained it meant acting as a technical expert for one side in a civil suit, Nichols agreed to take on an assignment.

"And I found out," he said, "that I do it well."

"He has a reasonably legal mind," David Simon told *Spectrum*. Simon, now a software engineer at GVO Inc., Palo Alto, was one of the first engineers to join Nichols at Probitas. "He will read the exact words of something and understand how lawyers will treat that. I also would imagine that he is extremely difficult for an opposing attorney to ruffle or move off his position; he does a huge amount of research, and by the time he is ready to give evidence, he is very



sure of it."

---

**"I locked the door, unplugged the phone, and didn't talk to anybody. I didn't even get out of my pajamas**

---

Nichols' first case as an expert witness had to do with a patent involving printer technology, owned by Wang Laboratories Inc., in Billerica, Mass., supposedly being infringed upon by Applied Computer Science Inc., in Seattle, Wash. Nichols was hired in 1986 by the attorneys for the Seattle company, and given reams of documents to study. He determined that one of the documents, in his opinion, demonstrated prior art, and gave a deposition explaining why. Later, Wang Laboratories settled the case.

More expert witness work quickly came Nichols' way, and he developed some technical tools to make his job easier. In particular, he produced software for searching disks for fragments of deleted files that can prove to be incriminating--like source code, often in contention in trade secrets cases. (He doesn't market these tools, just uses them for his work.)

Over time, Nichols began to earn a reputation as a smart--and extremely ethical--expert witness.

"Some judges define experts as a man you pay to speak your way," said attorney Schulman, who first encountered Nichols as an expert witness against one of his clients. "[But] Nichols is not a man who speaks your way; he speaks the way he sees it."

Nichols is thriving on his expert witness work, so much so that, in February, he sold Probitas to GVO in order to free up more time for it and his public service activities--he tutors high school students and volunteers as a mediator in civil disputes, including nontechnical ones.

"One thing I like is that you never know what you're going to be doing until the phone rings; it's always something brand new. I didn't know much about Java when I took the [*Sun* v. *Microsoft*] job. I didn't know how peer-to-peer networking worked a few months ago. I didn't know anything about audio fingerprinting until recently." Audio fingerprinting in music files is one of the technologies Napster is using to identify copyrighted material for blocking.

Nichols said being an expert witness takes a lot of skill. "Not only do you have to be technology savvy, you have to be capable of explaining that technology to lay people. I think I'm good at that."

Amazingly good, said Ajayi Lawrence, a junior at Palo Alto's Henry M. Gunn Senior High School, whom Nichols voluntarily tutors in math as part of a program called Foundation for a College Education. "I don't know how he does it," said Lawrence, "but when he explains something to me, it makes total sense, even when I didn't understand it in class."

"I also like the expert role," Nichols continued. "There is nothing more challenging than giving a deposition across from a really good lawyer. Your job is to tell the truth, but not give the store away, or let the attorney twist your words around. You must be on your toes for whatever time it takes, and it can take days."

Being a neutral expert is the best of all, he said, " because, in some small way, I think I'm helping to make the legal system better. I think that in all the cases, I've helped people understand the technology so they could make the right decisions. This is something you can't

always do if you're representing one side or another. It is rewarding."

## Then came Napster

After being selected as the neutral expert on the Napster case this spring, Nichols cleared his calendar of almost everything else.

"This is a lot different from anything I've been involved with before," he told *Spectrum*. "I feel an enormous sense of responsibility to do the right job, because Napster is talking about the future of the company on the one hand, and the recording industry and artists are talking about millions of dollars on the other."

"This is a heavy burden," he said.

But it is one Nick Nichols is ready to carry.

PHOTOGRAPHS: ROBERT HOUSER

Home | Search | IEEE Job Site | Advertising | Top



Copyright | Terms & Conditions | Privacy & Security | Subscription Prol

URL: http://www.spectrum.ieee.org (Modified: 30 September 2001)

**BayArea•com**

Newspaper Subscription

**Business & Stocks**
Top stories from The Mercury News

*Published Thursday, April 12, 2001, in the San Jose Mercury News*

# Judge gets technical help

## Nichols to analyze conflicting claims in Napster case

BY DAWN C. CHMIELEWSKI
Mercury News

A.J. ``Nick'' Nichols is about to be thrown into another techno-legal thicket.

U.S. District Court Judge Marilyn Hall Patel has appointed him to help her in the record industry's copyright infringement suit against Napster.

It's a familiar role for the Stanford University-trained engineer. Previously, he helped a federal judge sort through conflicting technical claims in Sun Microsystems' suit that accused Microsoft of corrupting its Java standard.

Nichols is frequently called to testify in intellectual property cases. He'll wade through conflicting claims about the effectiveness of Napster's filtering and advise Patel on alternate technologies that the recording industry claims could block more unauthorized songs.

Napster's text-based approach to filtering became a flash point in Patel's San Francisco court Tuesday when the attorney for the music publishers presented evidence that 84 percent of their songs were still available on the free music-swapping service.

That sort of courtroom animus should be nothing new for Nichols, whom federal district court Judge Ronald Whyte appointed as a neutral expert in the 1997 Sun case. Sun claimed Microsoft violated a Java licensing agreement -- and indeed, undermined the standard -- when it changed the application for the Internet Explorer browser. Microsoft agreed to pay $20 million in January to settle the case.

In the Napster case, Nichols will meet Friday with representatives from the online music service and the recording industry to talk about various approaches to blocking unauthorized songs from the Napster service.

Nichols declined to be interviewed. But mediators, lawyers and peers describe him as smart, calm and analytical.

``He's very even-tempered. He's not the sort of person who gets overly excited -- he gets down to the basic facts and lets them govern his emotions,'' said Alan MacPherson, a partner in the San Jose law firm of Skjerven Morrill MacPherson, who has used Nichols as an expert witness in technology cases. ``In some ways, that's a typical engineer: He likes to deal with objective things, things that are definable.''

Nichols received a doctorate in electrical engineering from Stanford in 1965 and holds three patents for computer memory, circuitry for video game displays and modem technology. He worked for a number of chip makers, including Intel, where he supervised the design and marketing of microprocessor test equipment. For the past 20 years, he has worked as a consultant for the Woodside-based firm he started, Probitas.

Howard Lloyd, director of San Jose-based Mediation Works, said Nichols has done extensive work as an expert witness. ``He strikes me as a very thoughtful and articulate person who would not shoot from the hip, but dig in and carefully examine the issues,'' Lloyd said. ``He has the ability to digest complex issues and then describe and discuss them in understandable terms.''

Nichols even worked to resolve disputes in the professional organization -- PATCA -- for professional and technical consultants. He was the first to meet with clients to discuss disputes with their consultants.

``The disputes which have risen to board level have been very few and far between. That's largely Nick's responsibility and his effectiveness in that role,'' said board member Ken Dinwiddie of Dinwiddie Associates in Palo Alto.

*Contact Dawn C. Chmielewski at dchmielewski@sjmercury.com or (800) 643-1902 .*

▲ **Back to Top**

© 2000 The Mercury News. The information you receive online from The Mercury News is protected by the copyright laws of the United States. The copyright laws prohibit any copying, redistributing, retransmitting, or repurposing of any copyright-protected material.

Stephen W. Melvin, Ph.D.                                                                                    Page 1 of 2

# Stephen Melvin, Ph.D.



melvin@zytek.com

- Ph.D. in Computer Science from the University of California at Berkeley
- More than 20 years experience in computer engineering
- Extensive experience in the field of intellectual property licensing and litigation
- USPTO Registered Patent Agent

## PROFESSIONAL BACKGROUND SUMMARY

**Zytek Communications Corporation**

Dr. Melvin is the founder and CEO of **Zytek Communications Corporation** (formerly **Zytek, Inc.**), which provides consulting services for design, implementation and testing of embedded systems, as well as patent prosecution and strategic intellectual property consulting.

**O'Melveny & Myers, LLP**

Dr. Melvin was previously a Patent Agent and Technical Advisor in the San Francisco office of **O'Melveny & Myers,** where he assisted in a broad range of intellectual property cases, including patent, copyright and trade secret litigation. Dr. Melvin also assisted clients in the preparation and prosecution of patents in many different areas of technology.

**FlowStorm, Inc.**

Dr. Melvin is a founder of **FlowStorm, Inc.** and was the Chief Architect and Director of RTL Development. FlowStorm developed a massively multithreaded packet processor for high performance stateful flow processing. Stateful processing of network traffic requires managing large amounts of memory at high-speed, a task not easily accomplished with current hardware, and is a fundamental requirement for emerging networking applications and services such as stateful firewalls, intrusion detection systems, and quality of service enforcement platforms.

**Clearwater Networks**

Previous to starting FlowStorm, Dr. Melvin was a Senior Architect at **Clearwater Networks** (formerly **XStream Logic, Inc.**), where he was responsible for the architecture and microarchitecture of the processing engine of Clearwater's innovative multi-threaded network processor (CNP810SP). The Clearwater processor incorporated a simultaneous multithreading (SMT) core allowing simultaneous execution of eight independent threads with eight ALUs and two ports to memory.

**Consulting**

- Dr. Melvin has wide ranging independent consulting experience, including work in advanced microprocessor architecture, network security, Internet related software and forensic disk analysis.

- Dr. Melvin has extensive experience in the intellectual property field, acting as a court-appointed expert, a testifying expert and a consulting expert in numerous legal cases involving patents, copyrights and trade secret issues. Litigation Consulting Cases

## PUBLICATIONS AND MEMBERSHIPS

### List of Publications

### List of Patents

Registered Patent Agent before the United States Patent and Trademark Office (registration number 50,467).

Co-chaired the 29th Annual International Symposium on Microarchitecture (Micro-29), held in Paris in December of 1996.

Previously a Visiting Scholar at the University of Texas at Austin, where he worked with the HPS Research Group.

Professional Society Memberships:

- The Institute of Electrical and Electronics Engineers (IEEE)
- The Association for Computing Machinery (ACM)
- The American Intellectual Property Law Association (AIPLA)
- The Intellectual Property Owners Association (IPO)

# Stephen Melvin, Ph.D.

## LITIGATION CONSULTING CASES

July, 2001 - October, 2001, **Testifying Expert, Intel v.** *Via Technologies*
Analysis of patents, AGP specifications, and other documents related to CPU/memory systems and architectures.

October, 1999 - May, 2000, **Testifying Expert, Accton v.** *Micro Linear Corporation*
July, 1999 - September, 1999, **Testifying Expert, Allied Telesyn v.** *Micro Linear Corporation*
Analysis of on-chip circuitry, testing procedures and data sheets for Ethernet controller ICs. Analysis of the application of Ethernet controller ICs in hubs and switches, design and testing. Compliance with data sheet and other published specifications.

March, 1999 - November, 2001, **Testifying Expert, Varian v. Delfino et. al.**
Analysis of web site logs and other documents related to posting of messages on Internet bulletin boards.

August, 1998 - December, 1998, **Court Appointed Expert, Cadence v. Avant!**
Assisted Northern California Federal District Court Judge Ronald Whyte in understanding issues and technology relating to CAD design software and its alleged copyright infringement and trade secret misappropriation.

June, 1998 - December, 1998, **Testifying Expert, Canter, et. al. v.** *West Publishing*
Analysis of source code, proposals, internal documentation and other materials relating to natural language processing of database queries in connection with patent and trade secret misappropriation case.

February, 1998 - November, 1998, **Testifying Expert, *Lucas Arts* v. Microstar**
Analysis of data files relating to game operation. Analysis of C header files and data formats, comparison of data files for various products.

May, 1998 - May, 2001, **Testifying Expert, Hilgraeve v.** *Symantec*
Analysis of source code, patents and other references relating to virus checking software. Analysis and operation of virus checking software and development operational tests.

June, 1998 - December, 1998, **Testifying Expert, General Patent v.** *Xircom, et. al.*
Analysis of patents and other references relating to modem and packaging technology.

May, 1998 - June, 1998, **Independent Expert, Rose Datasystems v. H.A.T.S.**
Analysis and comparison of source code for high availability systems.

December, 1997 - May, 1998, **Testifying Expert, Iomega v.** *Nomai*
Analysis and comparison of microcode for disk drive microprocessors and ASICs. Review of ASIC specification sheets and analysis of empirically derived firmware sequences.

June, 1997 - December, 1997, **Testifying Expert, Sharp Image Gaming**
Analysis and comparison of firmware for video slot machines. Review of EPROM contents including images for video display and microprocessor firmware.

May 1995 - May 1997, **Testifying Expert, DSC v.** *DGI*
Analysis and comparison of firmware for a microprocessor-based telecommunications board for copyright infringement. Concepts and practices in reverse engineering.

March 1996 - November 1996, **Testifying Expert,** *AMD* **v. Hyundai**
Analysis of flash EEPROM integrated circuits including analysis of internal circuitry, analysis of product development data and comparison of testing procedures in a trade secret case.

October 1996 - November 1996, **Testifying Expert,** *Texas Instruments* **v. Samsung**
Analysis of firmware (ladder logic) for programmable controllers used in assembly lines in a patent infringement case.

October 1996 - November 1996, **Independent Expert, IRIS v. TOA**
Software and system level analysis of computerized medical instrumentation. Reported directly to three judge panel in arbitration case.

September 1996, **Testifying Expert,** *AMD* **v. Minc**
Software analysis and software engineering issues for PLD design software in a contract dispute.

May 1996 - June 1996, **Testifying Expert,** *Nellcor Puritan Bennett* **v. Healthdyne**
Analysis of disk drives including file recovery in an employment dispute.

December 1992 - July 1993, **Testifying Expert,** *Conner Peripherals* **v. Western Digital**
August 1994 to December 1995, **Testifying Expert, IBM v.** *Conner Peripherals*
Analysis of the architecture of hard disk drives, including microcontroller firmware analysis, digital and analog circuit analysis, and dynamic testing. Analysis of patents and other references.

# Stephen Melvin, Ph.D.

## PUBLICATIONS

Melvin, S., Nemirovsky, M., Musoll, E., Huynh, J., Milito, R., Urdaneta, H., and Saraf, K., "A Massively Multithreaded Packet Processor," *Workshop on Network Processors - NP2,* Held in conjunction with the 9th International Symposium on High-Performance Computer Architecture, February 8-9, 2003. Slides to Presentation

(A version of this paper also appears as Chapter 6 of *Network Processor Design: Issues and Practices, Volume 2,* Morgan Kaufmann, 2003)



Melvin, S., and Patt, Y., "Handling of Packet Dependencies: A Critical Issue for Highly Parallel Network Processors," *CASES 2002 (International Conference on Compiler, Architecture, and Synthesis for Embedded Systems),* Grenoble, France, October 2002. Slides to Presentation

Melvin, S., and Patt, Y., "Enhancing Instruction Scheduling with a Block-Structured ISA," *International Journal of Parallel Programming,* 23(3):221-243, 1995.

Melvin, S., and Patt, Y., "Exploiting Fine-grained Parallelism Through a Combination of Hardware and Software Techniques," *Proceedings, 18th International Symposium on Computer Architecture,* Toronto, Canada, May 1991.

Melvin, S., "Performance Enhancement Through Dynamic Scheduling and Large Execution Atomic Units in Single Instruction Stream Processors," Ph.D. Dissertation, University of California at Berkeley, December 1990.

Melvin, S., and Patt, Y., "Performance Benefits of Large Execution Atomic Units in Dynamically Scheduled Machines," Proceedings, 1989 Supercomputer Conference, Crete, Greece, June 1989.

Melvin, S., Shebanow, M., and Patt, Y., "Hardware Support for Large Atomic Units in Dynamically Scheduled Machines," Proceedings, 21st Annual Workshop on Microprogramming and Microarchitecture, San Diego, California, November 1988.

Melvin, S., and Patt, Y., "The Use of Microcode Instrumentation for Development, Debugging and Tuning of Operating System Kernels," Proceedings, 1988 ACM SIGMETRICS, Santa Fe, New Mexico, May 1988.

Melvin, S., and Patt, Y., "A Clarification of the Dynamic/Static Interface," Proceedings, 20th Hawaii International Conference on System Sciences, Kailua-Kona, Hawaii, January 1987.

Gee, J., Melvin, S., and Patt, Y., "Advantages of Implementing Prolog by Microprogramming a General Purpose Host Computer," Proceedings, Fourth International Conference on Logic Programming, Melbourne, Australia, May 1987.

Melvin, S., and Patt, Y., "SPAM: A Microcode Based Tool for Tracing Operating System Events," Proceedings, 20th Annual Workshop on Microprogramming, Colorado Springs, Colorado, December 1987.

Wilson, J., Melvin, S., Shebanow, M., Hwu, W. and Patt, Y., "On Tuning the Microarchitecture of an HPS Implementation of the VAX," Proceedings, 20th Annual Workshop on Microprogramming, Colorado Springs, Colorado, December 1987.

Melvin, S., and Patt, Y., "A Microcode-Based Environment for Non-invasive Performance Analysis," Proceedings, 19th Annual International Workshop on Microprogramming, New York, October 1986.

Gee, J., Melvin, S., and Patt, Y., "The Implementation of Prolog via VAX 8600 Microcode," Proceedings, 19th Annual Workshop on Microprogramming, New York, October 1986.

Patt, Y., Melvin, S., Hwu, W., Shebanow, M., Chien, C., and Wei, J., "Run-Time Generation of HPS Microinstructions from a VAX Instruction Stream," Proceedings, 19th Annual Workshop on Microprogramming, New York, October 1986.

Patt, Y., Hwu, W., Melvin, S., Shebanow, M., Chien, C., and Wei, J., "An HPS Implementation of VAX: Initial Design and Analysis," Proceedings, 19th Hawaii International Conference on System Sciences, Honolulu, Hawaii, January 1986.

Patt, Y., Shebanow, M., Hwu, W., and Melvin, S., "A C Compiler for HPS I, A Highly Parallel Execution Engine," Proceedings, 19th Hawaii International Conference on System Sciences, Honolulu, Hawaii, January 1986.

Patt, Y., Melvin, S., Hwu, W., and Shebanow, M., "Critical Issues Regarding HPS, A High Performance Microarchitecture," Proceedings, 18th Annual Workshop on Microprogramming, Asilomar, California, December 1985.

## Stephen Melvin, Ph.D. - U.S. Patents

U.S. Patent 6,922,138: Vehicle Specific Messaging Apparatus and Method

U.S. Patent 6,981,110: Hardware Enforced Virtual Sequentiality

U.S. Patent 7,035,998: Clustering Stream and/or Instruction Queues for Multi-Streaming Processors

U.S. Patent 7,042,887: Method and Apparatus for Non-Speculative Pre-Fetch Operations in Data Packet Processing

U.S. Patent 7,058,064: Queueing System for Processors in Packet Routing Operations

U.S. Patent 7,065,096: Method for Allocating Memory Space for Limited Packet Head and/or Tail Growth

U.S. Patent 7,107,402: Packet Processor Memory Interface

## Stephen Melvin, Ph.D. - U.S. Published Patent Applications

U.S. Patent Application Publication 2003/0069920: Multi-Threaded Packet Processing Engine for Stateful Packet Processing

U.S. Patent Application Publication 2005/0267997: Apparatus for Input/Output Expansion Without Additional Control Lines

U.S. Patent Application Publication 2006/0218273: Remote Log Repository With Access Policy





Search [      ]  Go!

Home    People    Research    Admissions    Site Map

# Lee A. Hollaar

## Professor of Computer Science

Professor Hollaar's interests include text handling and retrieval, distributed systems and data communications, and intellectual property and computer law. He is the author of "Legal Protection of Digital Information," which covers copyrights and patents for computer software and other digital works, published by BNA Books and available on the Internet at no cost. He is currently working on the second edition of the treatise, with will also cover database protection, trade secrets, trademarks, and licenses. During the Fall 2006 semester, he is teaching CpSc 5960/6960, Digital Intellectual Property Law.

He played major roles in adding two words to the vocabulary of intellectual property law:
- **"Inducement"** was recognized by the Supreme Court in its unanimous *Grokster* opinion. The concept of liability for inducement of copyright infringement was revitalized in his paper *Sony Revisited: A new look at contributory copyright infringement*, and refined in his amicus brief in the case. The paper also led to the introduction of the Induce Act in the 108th Congress.
- **"Foreseeability"** as a limit on doctrine of equivalents in patent law is the heart of the Supreme Court's *Festo* opinion. It was proposed in the amicus brief whose filing he supervised as chair of IEEE-USA's intellectual property committee.

His current papers on computer and intellectual property law are available here, including the amicus brief he just filed with the Supreme Court in the *KSR v. Teleflex* patent case.

For more information about Professor Hollaar, see his short biography. For his current addresses, phone numbers, and schedule, see his .plan file.

Last updated: 08-27-2006

School of Computing • 50 S. Central Campus Dr. Rm. 3190 • Salt Lake City, UT 84112
801-581-8224 • Send comments to hollaar@cs.utah.edu
Disclaimer

Lee A. Hollaar is a Professor in the School of Computing (formerly the Department of Computer Science) at the University of Utah in Salt Lake City. He has taught a variety of software and hardware courses, and currently teaches computer networking and intellectual property and computer law.

He is the author of a treatise on the legal protection of digital information, available to the public at no cost on the Internet, as well as published by BNA Books. The first edition of the treatise includes overviews of patent and copyright law, in-depth discussions of software copyrights, copyright of digital material in a networked world, and patents for software-based inventions. He is currently working on the second edition of the treatise, with will also cover database protection, trade secrets, trademarks, and licenses.

He played a major role in adding two words to the vocabulary of intellectual property law:

- "Inducement" was recognized by the Supreme Court in its unanimous *Grokster* opinion. The concept of liability for inducement of copyright infringement was revitalized in his paper *Sony Revisited: A new look at contributory copyright infringement,* and refined in his amicus brief in the case. The paper also led to the introduction of the Induce Act in the 108th Congress.
- "Foreseeability" as a limit on doctrine of equivalents in patent law is the heart of the Supreme Court's *Festo*. It was proposed in the amicus brief whose filing he supervised as chair of IEEE-USA's intellectual property committee.

Professor Hollaar is currently working on a new approach to patent reform and laws governing shrink-wrap and click-on licenses.

Professor Hollaar was on sabbatical leave in Washington, DC, during the 1996-97 academic year, as a Committee Fellow in the intellectual property unit of the Committee on the Judiciary of the United States Senate, where he worked on patent reform legislation, database protection, and what eventually became the Digital Millennium Copyright Act. He was also a visiting scholar with Circuit Judge Randall R. Rader at the United States Court of Appeals for the Federal Circuit.

He has been a technical expert or consultant in a number of patent and antitrust cases. Based in part on his experience as the lead technical expert in the antitrust suits *Caldera v. Microsoft* and *Bristol v. Microsoft* (both of which settled in favor of the plaintiffs), and was the technical advisor to the States during the Microsoft settlement negotiations and the remedies phase of the trial.

He was a policy wonk on technology and intellectual property for the Dole presidential campaign, and is the database guru to the Capitol Steps.

He received his BS degree in electrical engineering in 1969 from the Illinois Institute of Technology, and his PhD in computer science in 1975 from the University of Illinois at Urbana-Champaign. Dr. Hollaar was on the faculty of the University of Illinois prior to joining the faculty of the University of Utah in 1980.

Professor Hollaar was one of the drafters of the Utah Digital Signature Act, which made Utah the first government in the world to recognize digital signatures as equivalent to handwritten ones. On November 19, 1997, as part of Utah's Digital Signature Day, Professor Hollaar executed the first legally-recognized digitally-signed will in the world.

He has conducted research on hardware and software tradeoffs in system design, particularly as they apply to systems handling large text databases. He is the co-inventor of a new method of rapidly

searching text stored on a disk, and was the primary architect for perhaps the first distributed, workstation-based information retrieval system. His past research has also included work on avionics and navigation systems. He was Director of Campus Networking during the development of the University's campus-wide data communications network, and remains involved with distributed systems and telephony.

Dr. Hollaar is a senior member of the IEEE, and served as chair its Intellectual Property Committee. He is also a member of ACM, and was the vice-chair of the Special Interest Group on Information Retrieval. Dr. Hollaar is a Registered Patent Agent with the United States Patent and Trademark Office, and is a founding member of the National Association of Patent Practitioners.

---

Last updated June 29. 2005
Comments to hollaar@cs.utah.edu



Papers on intellectual property and computer law by Professor Lee A. Hollaar of the School of Computing at the University of Utah.

- Amicus brief to the Supreme Court in the *KSR v. Teleflex* patent case, and the two papers that support it: "Unclear and Unconvincing: How a misunderstanding led to the heightened evidentiary requirement in patent litigation" and "The Motivation for the Federal Circuit Test"

- "A New Look at Patent Reform," published in the *Journal of the Patent and Trademark Office Society*, discusses the problems with current patents, especially for fast-moving technologies, and proposes a new, intermediate form of protection as a solution.

- "*Sony* Revisited: A new look at contributory copyright infringement" which discussed the liability of inducement of copyright infringement, of particular interest because of legislation pending in Congress. It was the basis for my amicus brief to the Supreme Court in *MGM v. Grokster*, whose unanimous decision confirms the position of the paper and the brief.

- "Bad Trade: Will Congress Unwittingly Repeal the Digital Millennium Copyright Act and Violate Our Trade Treaties?" a short note published by the Institute for Policy Innovation saying that changes to the DMCA could abrogate our trade treaties.

- "The Use of Neutral Experts" published in BNA's *Expert Evidence Report*, discusses the role of a neutral expert in litigation as a way to resolve issues much more efficiently.

- "Requesting and Examining Computer Source Code" published in BNA's *Expert Evidence Report*, discusses how source code is used in litigation.

- "Congress: Don't censor the internet, but help users avoid unwanted

material" written in 1997, just after the Supreme Court found the Communications Decency Act unconstitutional. With the Supreme Court finding the Child Online Protection Act has the same problems, it may be time to look at this proposed approach again.

- "Justice Douglas Was Right: The Need For Congressional Action On Software Patents" first published in the *AIPLA Quarterly Journal*, Volume 24, Number 1, pages 283-305, Winter 1996.

This web site is hosted by the School of Computing at the University of Utah, and is subject to this disclaimer.

Last updated: 08-26-2005

Reproduced with permission from *Expert Evidence Report*, Vol. 4, No. 24 (Dec. 20, 2004), p. 660.
Copyright © 2004 by The Bureau of National Affairs, Inc. (800-372-1033) <http//www.bna.com>

660    (Vol. 4, No. 24)

# Analysis&Perspective

Sometimes the use of a neutral expert—one not affiliated with any party in a dispute—can resolve issues much more efficiently. There are a number of roles that a neutral expert can play, says Dr. Lee Hollaar, a professor of computer science who has been a court-appointed expert, arbitrator, or special master in a number of computer software cases.

Based on his experiences, Hollaar discusses ways that neutral experts can be used, and suggests how such experts can be selected and how they can carry out their work.

## The Use of Neutral Experts

By Lee A. Hollaar, Ph.D.

We normally associate experts with one of the sides of a case, with the expert either testifying for that side or providing support to the attorneys as they try to understand and evaluate the issues in the case. But there also are times when an expert not affiliated with either side can help to resolve the issues far more efficiently.

The role of a neutral expert can run the gamut from providing a factual answer to a particular question after reviewing the evidence, to deciding the case as an arbitrator. It really depends on the creativity of the judge or a party in seeing an unconventional way to resolve a matter.

### Court-appointed Experts

The most common role for a neutral expert is as a court-appointed expert. Federal Rule of Evidence 706 governs such an appointment.

The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses

*Dr. Lee A. Hollaar is a professor in the School of Computing at the University of Utah in Salt Lake City, where he teaches networking and computer law. He is the author of* Legal Protection of Digital Information, *published in 2002 by BNA Books and available at no cost at http://digital-law-online.info. He was a committee fellow at the Senate Judiciary Committee, where he worked on patent reform legislation and what became the DMCA, and was a visiting scholar at the Federal Circuit. He has been the technical expert in a number of intellectual property and antitrust cases, and is on the recruitment and screening panel of the American Association for the Advancement of Science CASE project. Professor Hollaar is a member of the Advisory Board of* Expert Evidence Report, *and can be reached at hollaar@cs.utah.edu.*

should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection. An expert witness shall not be appointed by the court unless the witness consents to act. A witness so appointed shall be informed of the witness' duties by the court in writing, a copy of which shall be filed with the clerk, or at a conference in which the parties shall have opportunity to participate. A witness so appointed shall advise the parties of the witness' findings, if any; the witness' deposition may be taken by any party; and the witness may be called to testify by the court or any party. The witness shall be subject to cross-examination by each party, including a party calling the witness.

Such a court-appointed expert can be of value when there is little or no dispute about the underlying facts, but each side—through their experts—puts their particular spin on them, oftentimes downplaying any agreement. This leaves the judge, who has to decide the particular shade of gray, listening to one side telling him that things are white while the other side tells him that things are black.

A particularly interesting use for a court-appointed expert is the examination of computer source code to determine whether there is a trade secret misappropriation or copyright or patent infringement. There can be no question what is actually in the source code and what function it performs. The primary need for an expert is to protect trade secret status by making it unavailable to a competitor but allowing testimony about what it contains through an expert employed for that purpose. (There is generally a protective order in place, preventing the expert from using the information gained through the litigation in future activities.)

### Advantages in Having a Neutral Expert

There are advantages to both sides in using a neutral court-appointed expert. The time and expense of using a single expert will often be considerably less than if each side has its own expert, leading to a faster completion of the case. This is not only because both sides are sharing the costs of the neutral expert, but also because each side is more willing to cooperate with the court-

appointed expert in providing the information needed by the expert to resolve the factual issues.

It is all too common in computer software litigation for a party to respond to a discovery request by either resisting such a production request or by burying the other side in source code consisting of many versions, with no significant difference as to the matter being considered, and to produce that material in a form inconvenient for easy examination. Listings of source code can fill many boxes even for a small program with many versions, and it is impossible to search for something using the normal tools used by a software developer. Even electronic production could be in the form of image files of the source code, with each page being a separate image, again making it difficult to find a key needle within a haystack of image files.

> **The appointment by the court of an expert to examine the source code substantially changes the dynamics of the situation. . . . [T]he parties want the expert to see how the source code supports their position and not that of the other side, especially when they realize that the report of the neutral expert may decide the case.**

In contrast, the appointment by the court of an expert to examine the source code substantially changes the dynamics of the situation. It now may be advantageous for a party to be forthcoming to the neutral expert, since he or she is not working for the other side. Instead, the parties want the expert to see how the source code supports their position and not that of the other side, especially when they realize that the report of the neutral expert may decide the case.

The court can reinforce this by modifying the fee-splitting provisions of the expert's appointment (generally, each side pays half) to require a party to pay all the expert's fees and costs when the expert must expend additional effort because the party was not forthcoming with information—source code or answers to questions—requested by the expert. This changes delay and obfuscation from something that costs the other side to something that directly affects a party.

The use of a neutral expert also helps overcome the tendency for the plaintiff in a trade secret or copyright dispute to "mine" the source code to try to find anything that might support its claims against the defendant. The court-appointed expert instead will be looking first at the big picture: Is there substantial similarity between the defendant's source code and the plaintiff's code?

## Two Examples

In one case, the parties asked me to review the source code and give a preliminary opinion about whether defendant's program was based on the plaintiff's. I was able to provide that opinion and answer the parties' questions after spending about four hours reviewing the

code and talking with each party's programmers because of substantial differences between the two programs. What was needed was not an extensive analysis of the two programs, but a way for each side to provide their information to a trusted neutral rather than to the other side's "hired gun."

In another trade secret case in which I was the court-appointed expert, the defendants had worked for the plaintiff and immediately after leaving had started marketing a very similar system. Without examining the source code, it would be difficult for the plaintiff to say what trade secrets were misappropriated, but such an examination could easily turn into a hunt for trivial similarities, especially if places where the two systems were similar were the result of external considerations or generally-known techniques not protectible as trade secrets.

It was not difficult to find portions of the plaintiff's system in the defendants' source code, but it was not clear whether that constituted trade secret misappropriation, since the same people had written both and the defendants were claiming that many parts of the plaintiff's system were based on ideas and programs they had before they were hired by the plaintiff.

Looking first for things that had only minor or no changes between the plaintiff's system and the defendants' system, I asked the defendants for any evidence or information they could provide regarding what I had found. In some cases, they were able to demonstrate that the program modules had been written before they were hired by the plaintiff (and, when asked directly, the plaintiff confirmed this). In other cases, they pointed to articles that they felt described the techniques implemented in the source code.

After the initial examination, I wrote a preliminary report and forwarded it to each side for their comments. They then submitted additional information that I should consider. After a couple of iterations, the issues were clearly framed and I was able to produce my final report for submission to the court.

In some instances, I was not able to answer whether there was a misappropriation because that depended on how contracts and business relationships were considered, but I was able to indicate how the issue could be decided after those issues were resolved.

From start to finish, I spent less than 40 hours comparing two systems with hundreds of different modules, with no clear initial indication of what the trade secrets might be (beyond the system as a whole) and whether they had been copied. It wouldn't surprise me that if the court had not appointed a neutral expert, each side's experts could have spent more than 100 hours each and the court then having to resolve two very conflicting views.

## Other Roles for a Neutral Expert

While I have just described the most common role for a neutral expert, there are a number of other ways that they can be employed.

One judge appointed a medical school professor to serve "as a sounding board for the court to think through the scientific significance of the evidence," to "assist the court in determining the validity of any scientific evidence," and to "assist the court in determining the validity of any scientific evidence, hypothesis or

theory on which the experts base their economy" in a highly-technical medical case.[1]

While certainly helpful to the judge, most litigants would be rightfully worried about the use of an expert in the judge's chambers. While the role might look like that of a law clerk, there is a difference between researching what was said in past cases and helping the judge evaluate the facts. The danger is magnified when the "helper" is a skilled expert in the area: The judge may end up relying on the help rather than the case record. This can be particularly problematic because any appeal will give great deference to the findings of fact, while reviewing the applicable law without deference.

Most lawyers would be concerned about letting effective control of their case go to a neutral expert. But if the expert has to produce a report that can be questioned (and perhaps use the preliminary report process described above), it is clear to the parties how the court-appointed expert is influencing the case, and there is a mechanism to correct any misunderstandings. That is not true when the expert is working in chambers.

If it is advantageous to give the neutral expert a role in the ultimate resolution of the case beyond that of providing an unbiased assessment of the factual evidence, there are two ways that it can be done: appointment of the expert as a special master for a particular aspect of the case, or the use of the expert as an arbitrator deciding the matter.

## The Expert as a Special Master

Rule 53 of the Federal Rules of Civil Procedure provides for the appointment of a special master by the court:

(1) Unless a statute provides otherwise, a court may appoint a master only to:

(A) perform duties consented to by the parties;

(B) hold trial proceedings and make or recommend findings of fact on issues to be decided by the court without a jury if appointment is warranted by

(i) some exceptional condition, or

(ii) the need to perform an accounting or resolve a difficult computation of damages; or

(C) address pretrial and post-trial matters that cannot be addressed effectively and timely by an available district judge or magistrate judge of the district.

* * *

(3) In appointing a master, the court must consider the fairness of imposing the likely expenses on the parties and must protect against unreasonable expense or delay.

An example of an "exceptional condition" is when there is a difficult question that involves both fact and law that must be resolved, and the use of an expert in the technical area in place of the judge will substantially expedite the proceedings and give a sounder result. This is similar to the specific example given in the rule, where an expert in accounting or economics may be appointed as a special master "to perform an accounting or resolve a difficult computation of damages."

In most instances, a court-appointed expert can provide the court with the information necessary to make a decision and a special master is unnecessary, although it may be useful to give the court-appointed expert the ability to conduct a hearing on a particular matter to help make a finding of fact. If there are matters of law that need to be resolved so that the expert can make his determination, they can be referred to the court (although this could increase the time to resolution if things keep going back and forth between the court and the expert) or the expert can make findings conditional on later determination by the court.

One instance where it may be necessary for the neutral expert to serve as a special master, rather than a court-appointed expert, is in the interpretation of the claims of a patent. The task of interpreting a claim is to determine what the claim is from the perspective of one skilled in the art of the invention, something particularly suited for an expert. But the Supreme Court has held that "the construction of a patent, including terms of art within its claim, is exclusively within the province of the court" as a matter of law.[2]

To help understand how a skilled artisan would understand a claim, judges hear often-conflicting testimony from experts about the accustomed meaning of the terms of a patent. While the answer to claim interpretation questions is generally found in the patent itself, because the judge most likely is not trained in the technology, he or she somehow has to learn what the patent really says from the contrary testimony of the parties' experts.

---

**The special master can easily see which arguments from the parties have technical merit and should be examined in depth, and which are more hopeful than substantive.**

---

This has led to an almost-religious reliance on dictionaries in claim interpretation as a way to determine how a person skilled in the art of the patent would understand the claim.[3] But unless you know which definition to select—which requires an understanding of how the term is used in the technology—dictionaries are of little real help.

However, if a neutral expert in the technology is appointed as a special master for claim construction, he or she can make recommended findings of law to the judge on how the claim should be construed based on an understanding of the technology in general and the invention in particular. It will be far easier for the neutral expert to separate the invention from its described embodiments (one of the fundamental errors in claim construction is to limit the invention to an embodiment)

---

[1] Quoted by Justice Stephen Breyer in "The Interdependence of Science and the Law," *AAAS Science and Technology Yearbook 1999*, http://www.aaas.org/spp/yearbook/chap9.htm.

[2] *Markman v. Westview Instruments*, 517 U.S. 370, 38 USPQ2d 1461 (1996).
[3] The Court of Appeals for the Federal Circuit, which hears all patent appeals, is currently considering the rules for claim construction, and in particular the role of dictionaries. See *Phillips v. AWH Corporation*, 376 F3d 1382, 71 USPQ2d 1765 (1994).

---

and give each term its broadest interpretation consistent with the patent and its prosecution history.

The use of a special master who is an expert in the technology of the patent can substantially shorten the time necessary for claim interpretation in a patent case. There is no need to educate the special master about the technology, as there would be with a judge. The special master can easily see which arguments from the parties have technical merit and should be examined in depth, and which are more hopeful than substantive.

Some of the concerns the parties may have about having a technical expert who is not a lawyer acting as a special master can be reduced by the court reserving the power to sanction a party for not providing requested information, instead having the special master refer such matters to the court. The court, in its order appointing the special master, can also permit *ex parte* communications with the court, so that the court can assist the special master's activities if necessary.

### The Expert as an Arbitrator.

Finally, the neutral expert can be the ultimate decision maker if the case is referred to arbitration, either because it falls under a contract with a binding arbitration clause or the parties ask the judge to order arbitration.

While the neutral expert could be the sole arbitrator, because most arbitrations will involve not only technical questions but also questions of law, it might be more reasonable for the neutral expert to be one member of a panel of three arbitrators. That would permit an attorney familiar with arbitration procedures and the rules of evidence to be panel chairman and supervise the hearing.

### Selecting a Neutral Expert

So, how does one select a neutral expert? Most important in the selection process is a procedure where all parties feel that the selected expert is truly neutral.

For a court-appointed expert or special master, the judge can simply appoint somebody he or she knows is an expert in the area because the expert has appeared before the judge in an unrelated matter and the judge was impressed by the expert. Or the judge can ask others— particularly other judges—for recommendations. The judge could also contact local universities to locate a professor who works in the field but is not associated with the case or its attorneys. The expert should, of course, disclose any past relationship to the parties, their counsel, the action, or the court, and allow the parties to object to the appointment.

Another common way of selecting a neutral expert is for each party to put together a list of possible experts, allow the other party to strike those to whom they object, and submit the final list to the judge for the final selection.

> ## Most important in the selection process is a procedure where all parties feel that the selected expert is truly neutral.

If there is a concern that a single technical expert would in essence be deciding the case, a panel of three neutral experts could be formed. There are a variety of ways to do this. One would be for the court to appoint the chair of the panel using one of the ways just discussed. The chair then selects the second member of the panel from a list provided by the plaintiff, and the third member from a list provided by the defendant, perhaps after interviewing them.

Another way would be for the plaintiff and the defendant to each select a panel member (perhaps from each other's list) and those two neutral experts select the third panel member.

For arbitrations where a neutral expert is wanted for the panel, the organization overseeing the arbitration may want to alter their procedures for selecting that arbitrator. The standard procedure could be used to select the two non-expert arbitrators for the panel, while the expert is either selected by the other two arbitrators or by the parties from a special list of technical experts. Arbitration organizations that handle technical cases may want to establish a procedure to recruit technical experts for such special lists, perhaps adapting their qualification rules to recognize that they will be used as part of panels where the other arbitrators have been trained in the necessary procedures.

Finally, and maybe the easiest way, the American Association for the Advancement of Science (AAAS) has a demonstration project to assist courts and arbitrators in finding and appointing scientific experts. With help from a recruitment and screening panel that includes representatives from the major scientific and engineering societies, AAAS staff locates and screens experts with the background necessary for a particular case and without conflicts of interest. More information on the AAAS project can be found at http://www.aaas.org/spp/case/case.htm.