65679-2-0
TIMOTHY R. VOLKMANN, SBN 098280
BURTON, VOLKMANN & SCHMAL, LLP
133 Mission Street, Suite 102
Santa Cruz, CA 95060
Telephone: (831) 425-5023
Facsimile: (831) 427-3159

CYNTHIA M. JUDY, SBN 169648
8882 Dyer Road
Prunedale, CA 93907-8780
Telephone: (831) 663-8851

Attorneys for Plaintiff
REVOLUTIONARY SOFTWARE, INC.

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| REVOLUTIONARY SOFTWARE, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> ECLIPSYS CORPORATION, a corporation; ) <br> and DOES ONE through TEN, inclusive, ) <br> ) <br> Defendants. ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> _____) | Case No.: C05-03127 JW <br><br> **PLAINTIFF'S RESPONSE AND OBJECTION TO SECOND REPORT OF THE SPECIAL MASTER AND PROPOSED ORDER** <br><br> Date: N/A <br> Time: N/A |

Plaintiff Revolutionary Software, Inc. ("RSW") submits this Response and Objection to the Second Report of the Special Master ("Second Report") submitted to the Court and served on the parties on May 14, 2007, and objects to the Court's adoption of the Second Report. The Second Report demonstrates that the Special Master did not fulfill the charge defined by the Court in appointing him, did not answer the threshold question he articulated, and did not complete the Initial Task. The Second Report merely rules out a single Eclipsys product and confirms the presence of

- 1 -

Plaintiff's Response and Objection to Second Report of Special Master                   CASE NO. C05-03127 JW

the Licensed Software in one other Eclipsys product, and it does not help resolve any of the issues in this case.

Court's Charge to Special Master

On June 22, 2005, Plaintiff RSW sued Eclipsys Corporation for failing to timely report sales, pay license fees, and other breaches of a Software License Agreement ("SLA") between the parties. The parties dispute which Eclipsys products are subject to the SLA and how license fees are to be calculated.

At a Case Management Conference on October 17, 2006, the Court determined that the issue of what products are covered by the SLA should be resolved before the accounting issues and announced its intention to appoint a Special Master. On December 11, 2006, the Court notified the parties of its intent to appoint A. J. Nichols, Ph.D. as Special Master to "examine and report on the origin of the products in-suit" and "to evaluate the source code and its derivatives as used under the terms of the agreement."

Plaintiff objected that the appointment was premature, and possibly unnecessary, because plaintiff had not yet received or reviewed any discovery documents from Eclipsys. Plaintiff also objected to having the Special Master examine and evaluate its source code because the content of the source code was not an issue in the case and examination of the source code would not be helpful in resolving any issues in the case.

On January 3, 2007, the Court conducted a telephonic case management conference, overruled plaintiff's objections, and appointed Dr. Nichols to serve as Special Master. The Court instructed the parties to meet with the Special Master to outline the technical issues and develop a scope of work for the Special Master.

Special Master's Initial Task/Initial Report

On January 16, 2007, the parties met with the Special Master to discuss his scope of work. Based on the representations of Eclipsys' attorney at that meeting, the Special Master decided to focus initially on investigating Eclipsys' claim that no products derived from the Emtek Clinical Information Management System (CIMS) software (which contained the licensed software) had been delivered to new customers since September 1998. The Special Master asked each party to

- 2 -

provide certain materials and access to its software.

On February 1, 2007, the Special Master filed his Initial Report, which included a discussion of RSW's and Eclipsys' products and a statement of what he considered the immediate issue: "to determine if the current Eclipsys products use the Licensed Software" (Initial Report, Section 3, Page 3). The Special Master concluded there was no need to examine RSW's source code (Initial Report, Section 4.3, Page 4) .

Plaintiff articulated its concerns and objections to the Special Master's Initial Report. Plaintiff pointed out that in order to answer the question about sales of products containing the licensed software after 1998, the Special Master would first need to determine which Eclipsys products were derived from the Emtek CIMS software that contained the licensed software. Plaintiff noted that Eclipsys admitted in its Answer to the Complaint that its Continuum 2000 product was subject to the SLA; in dealing with the Special Master, Eclipsys admitted there were 24 versions and releases of four different products that were subject to the SLA. To resolve this issue, plaintiff recommended that the Special Master begin by confirming that accuracy of Eclipsys' admitted version chart and working forward chronologically from that point to identify any other Eclipsys products that were based on Emtek CIMS.

Plaintiff also noted in its correspondence and objections the imprecise and ambiguous use of product nomenclature in the Initial Report, the omission of any mention of the Sunrise Critical Care product Eclipsys admits was based on Emtek CIMS, the omission of certain important details about RSW's software, and the apparent acceptance of a number of Eclipsys' assertions as facts, although plaintiff disputed their accuracy. In response, the Special Master issued a Supplement to the Initial Report on February 9, 2007.

In a fax to the Court on February 13, 2007, the Special Master proposed to start examining Eclipsys' current product unless the parties objected. Plaintiff objected to this approach of ruling out Eclipsys' current products one at a time as inefficient and unproductive. Plaintiff again suggested that the Special Master start his investigation with an examination of the products Eclipsys admits contain the licensed software and then work forward chronologically from there. Plaintiff also objected to not having access to the materials or information the Special Master was reviewing.

1  On March 4, 2007, the Special Master filed a proposed order allowing him to proceed with
2  the investigation. To alleviate some of plaintiff's concerns, the Special Master indicated he would
3  test his proposed methodology on the most recent version of Eclipsys' CIMS-based products to
4  confirm he could effectively identify the presence of the licensed software in a product Eclipsys
5  admitted contains the licensed software.

6  On March 10, 2007, plaintiff filed formal objections to the Special Master's proposal to
7  begin investigating Eclipsys' current product. On March 16, 2007, the Court entered an Order
8  allowing the Special Master to proceed as he had proposed.

9  Special Master's Investigation

10  After the Initial Report was issued, Eclipsys provided the Special Master with a laptop and
11  other materials. Plaintiff posed a number of questions to Eclipsys about the laptop configuration and
12  the documents provided, which Eclipsys declined to answer, indicating they would respond to
13  formal discovery requests for this information. Eclipsys did agree to allow plaintiff's attorneys and
14  consultants to come to its attorneys' office in Palo Alto at some future time to examine a laptop
15  purporting to contain the same files and materials examined by the Special Master. Plaintiff
16  objected to this lack of transparency and asked the Special Master to provide information about the
17  specific versions of software he was examining and about the documents he was reviewing, but the
18  Special Master referred these issues back to the parties to be resolved. Although the Special Master
19  provided some details in his Second Report, most of plaintiff's questions about the configuration of
20  the laptop and the software provided remain unanswered.

21  To aid the Special Master's investigation, Eclipsys provided a 340-page document and an 11-
22  page document designated under the Protective Order as "CONFIDENTIAL - ATTORNEYS AND
23  CONSULTANTS ONLY," a classification intended to protect highly sensitive materials like source
24  code. Plaintiff questioned the appropriateness of the designation when these documents were first
25  provided, and the Special Master confirmed that the documents contained design details and
26  information that were indeed highly sensitive, warranting protection tantamount to source code.
27  After he completed his investigation and before the Special Master issued his final Second Report,
28  plaintiff again asked for confirmation that the "CONFIDENTIAL - ATTORNEYS AND

- 4 -

CONSULTANTS ONLY" designation was indeed appropriate. The Special Master responded at that time that he did not recall the 340-page document or its contents. After reviewing the materials again, the Special Master advised that he found nothing in the 340-page document that should prevent it being disclosed to the plaintiff, and that certain portions of the 11-page document could be redacted, and he recommended that Eclipsys consider allowing plaintiff to review those materials. Eclipsys refused, depriving RSW representatives of the ability to review and understand these seemingly important documents.

Second Report

The Special Master provided the parties with copies of his draft Second Report in early May and invited comments. Eclipsys proposed a number of revisions to clarify the specific products the Special Master investigated, and plaintiff requested information on the specific product names, versions, and release dates. The Second Report filed on May 14, 2007, while containing more details than the initial draft, raises concerns about the validity of its conclusions as well as the lack of precise terminology and confusing product nomenclature in the document.

In his Second Report, the Special Master concluded that the current Eclipsys Sunrise XA platform and current version of the Sunrise Clinical Manager program do not contain the licensed software and were developed independently of the Emtek CIMS software. The Special Master also confirmed that a current version of Eclipsys' Sunrise Critical Care program does contain the licensed software. These conclusions were based on the Special Master's examination of only two Eclipsys products.

The terminology used by the Special Master in his Second Report compounds the confusion caused by Eclipsys' naming choices. For example, throughout the Second Report, the Special Master uses the name Sunrise Clinical Manager ("SCM") to refer to Eclipsys' current XA software, although Eclipsys used this same product name as early as 1998 and 1999 to refer to a suite of products that were based on Emtek CIMS. The Special Master refers to Eclipsys products based on Emtek CIMS as Sunrise Critical Care ("SCC"), although Eclipsys uses this name to refer to the clinical documentation functionality in its current XA products. The Special Master found that "the Eclipsys Sunrise XA platform and the Sunrise Clinical Manager program" do not use the licensed

1  software, without defining which specific product versions and release dates are included in this
2  sweeping conclusion.  In Section 1.1. of the Second Report, "Summary of Findings," the Special
3  Master implies that the use of SQL is incompatible with the licensed software, contrary to a number
4  of documents plaintiff provided indicating that the Emtek software was fully compatible with SQL at
5  the time Eclipsys acquired it in 1998.  These imprecise and misleading summary statements could be
6  misconstrued, overlooking earlier Eclipsys products that are indeed subject to the SLA.

7          <u>Objections to Second Report</u>

8          In his Initial Report, the Special Master wrote:  "If it is determined that the *current* Eclipsys
9  products do not contain the Licensed Software, that still leaves the possibility that Eclipsys installed
10 the Licensed Software for new customers after 1998 and before the release of the new system in
11 2004"  (Initial Report, Section 3, Page 4).  With release of his Second Report, the Second Master has
12 ruled out one current Eclipsys product, identified as "Sunrise XA Version 5.7 (Sunrise 4.5 SP3),"
13 and confirmed the presence of the licensed software in another.  The Special Master admits his
14 investigation did not examine other products in the Sunrise XA platform (Second Report, Section
15 1.1, Page 1).  The Special Master did not confirm the accuracy of the chart Eclipsys provided
16 showing the versions and release dates of the four products Eclipsys admits contain the licensed
17 software.  Given these findings, plaintiff questions the usefulness of the Special Master's Second
18 Report in resolving any of the disputed issues in this case.

19         Plaintiff questions the reliability of the Special Master's investigation methodology and
20 objects to adopting any of the findings in his report without an opportunity for independent review
21 and verification.  Plaintiff questions the reliability of the Master's memory:  the master initially
22 forgot that the parties agreed that SCC was a product in-suit and disputed, he forgot essential access
23 information, and he forgot that 340 pages of technical material had been submitted and reviewed.

24         The Special Master's conclusions do not address the Court's original charge to examine and
25 report on the origin of the products in-suit.  Instead, the investigation was focused on ruling out a
26 current product to confirm Eclipsys' claims that this product was not based on Emtek CIMS, and
27 thus not subject to the SLA.  The Special Master's report does not address what products Eclipsys
28 was selling and delivering to customers before 2004 when its XA platform was released, nor does it

Plaintiff's Response and Objection to Second Report of Special Master         CASE NO. C05-03127 JW

1   address the possibility that other XA modules did or should have contained the licensed software if
2   they were subject to the SLA.  The investigation did not answer the question the Special Master
3   posed as his initial task, determining whether Eclipsys delivered any Emtek-CIMS products to new
4   customers since September 1998.  The investigation did not identify which Eclipsys products are
5   indeed subject to the SLA, nor did it distinguish old from new customers (an irrelevant point from
6   plaintiff's perspective anyway, because the SLA requires payment of license fees for all covered
7   products sold or delivered to anyone, new or old).

Conclusion

9   The Special Master has spent 63.5 hours thus far and produced two reports of limited use,
10  with substantial qualifications and specifications of what has not been done.  Plaintiff objects to the
11  Court adopting the Special Master's report at this time, as well as to the potential admissibility of
12  any of the Special Master's findings.  Plaintiff recommends that the parties proceed with discovery
13  as a more productive way of obtaining information that will help resolve our product and accounting
14  issues.
15  If the Court does decide to adopt the Special Master's findings, plaintiff requests that the
16  Second Report be modified as follows:
17  1) Clarify that the findings were based on an examination of a single Eclipsys product, that
18  no other versions of that product were examined, and that no determination was made regarding
19  whether or not this product is subject to the SLA.
20  2) Further specify and clarify that the current name, product number, release date, and which
21  specific component modules of the Sunrise XA software were examined.
22  3) Further specify and clarify the product name, number, and release date of the Emtek
23  CIMS product examined.  As noted in our discussion of the confusing product nomenclature earlier,
24  Eclipsys' Sunrise Critical Care program, originally called Emtek CIMS, has been called various
25  names by Eclipsys, including Sunrise Critical Care, SCC, Emtek, Sunrise Clinical Documentation,
26  SCD, Continuum 2000, ClinDoc, and Analytical Information Manager (AIM).  Sunrise Clinical
27  Manager, the term the Special Master uses to refer to software that operates on Eclipsys' Sunrise XA
28  platform, was a name that was also used by Eclipsys to refer to a suite of products containing

- 7 -

Sunrise Clinical Care, a product Eclipsys admits is based on Emtek CIMS.

Plaintiff respectfully requests that the Court not adopt the Second Report, or, alternatively, order that the report be modified to clarify the products that were examined and limited applicability of the Special Master's findings.

Dated:  June 4, 2007                    LAW OFFICE OF CYNTHIA M. JUDY
                                        BURTON, VOLKMANN & SCHMAL, LLP


                                        By:_____/s/_____
                                                Cynthia M. Judy

                                        Attorneys for Plaintiff Revolutionary Software, Inc.

**PROPOSED ORDER**

Upon consideration of the Second Report of the Special Master, Plaintiff Revolutionary Software's Response and Objections thereto, and the record in this case, it is

ORDERED that the Second Report of the Special Master is not adopted.


Dated:_____        _____
                                            The Honorable James Ware
                                            United States District Court Judge